## T. J. CHAMBERS v. JOSIAH FISK AND OTHERS.

In the organization of the Mexican system of government, under the constitu-
tive Act and the Constitution, while the exclusive power to legislate, upon
all subjects pertaining to the Federal Union, or the foreign policy of the
nation, was conferred upon the General Congress, in all that belonged to
their internal government and administration, the States retained their
liberty, independence and sovereignty.

The General Government, in recognizing the States, as organized under their
constitutions, conceded to them the right of internal administration, as effect-
ually as though the States had first been free and independent sovereignties,
and had by joint concession and agreement, formed the federal government.

While the courts, under their system, had no authority to judge of the consti-
tutionality of the laws, but were bound to execute them without questioning
their validity, ample precautions were devised to detect any violations of their
constitutions.

The President had power to make regulations, decrees and orders, for the
better observance of the constitution, constitutive Act, and general laws.  He
was given a supervision over the courts.  A permanent council of govern-
ment was formed, a material part of whose business it was to watch over the
constitution, constitutive Act, and general laws ; and to congress was given
the right to interpret the constitution, in doubtful cases, and to punish those
violating it.  Tribunals were established to punish the higher officers for
infractions of the constitution; and even the governors of the States, were
subject to be tried for infractions of the constitution, the laws of the Union,
or orders of the President, not obviously contrary to the constitution and
general laws of the Union.

The same features are found in the constitution of Coahuila and Texas. It was made the duty of two bodies in the State, to wit, the Permanent Deputation and the Executive Council, to watch over the observance of the constitutive Act, the constitution and general laws of the Union, and the private laws of the State, in order to give notice to congress of the violations they might have observed.

It was not their policy to permit unconstitutional measures to be adopted, and stand as of force, to be executed, and to be complicated by apparent rights growing up under them. That this was not only the theory, but the practice of the government, is shown by the decrees of the general congress, interpreting the federal constitution, restricting the operation of parts of the constitution of a State, and annulling laws enacted by the States.

That a law, subject to these ordeals of supervision and abrogation, was suffered to remain in force long enough for rights to be acquired under it, is a strong circumstance in favor of its validity.

The right to the vacant domain in the State, with the full power to dispose of it, was openly and expressly claimed in the constitution and laws of Coahuila and Texas, and was never sought to be controlled or prevented by the general government, except upon reasons of federal policy, in reference to the introduction of colonists from the United States of the north; and then only in 1835, when the General Government, with usurped power, was on its march to the annihilation of the States; and this was protested against by the congress of the State.

The General Colonization Law (Decree No. 72) was enacted on the 18th of August, 1824, by the constituent congress, before the State governments were organized; and emanating from the then supreme power, it was in force in all the Provinces or States; and the 12th article fixed a limit to the amount of land to be united in the same hands, *with right of property*. This implies some discretionary regulations, to be adopted as to the time, and means, to accomplish the general object of the restriction.

In 1825, the State of Coahuila and Texas enacted a colonization law "to aug-"ment the settlement of its territory, to advance the raising and increase of "stock, and the progress of arts and commerce, in conformity to the consti-"tutive Act, the constitution of the Republic, and the basis established by "decree No. 72, of the general congress."

And under this general basis, and *treating it merely as a general basis*, the State established the details of a system, adapted to its local condition; for, while the restriction contained in the general colonization law, was not to the specific amount of eleven leagues of land, whatever might be its quality; but to one league, if it was irrigable land; to four, if arable; and to six, if pasture, making eleven in all of different sorts; under the law of the State, the land was granted without reference to quality, further than in relation to the price to be paid for it; and it permitted more than eleven leagues to be acquired by empresarios, subject to the conditions contained in the law.

Chambers v. Fisk.

The restriction, as to the quantity of land to be granted, contained in the 12th article of the General Colonization Law, after the full organization of the State governments, was recommendatory, and as it pertained to the internal administration of the State, was subject to be controlled, to suit the local condition of the respective States.

If it pertained to the Federation to determine how much land the State should give or sell to a colonist, that would not control this case; for the act under which the appellant claimed, was not part of a colonial system, but an appropriation of the means of the State to pay one of its officers.

The 12th article of the General Colonization Law, constituted no barrier to the acquisition of more than eleven leagues of land, under articles 17 and 239, of decree No. 277.

The decree No. 277, establishing a system of judicature, adapted to the wants, principles and intelligence of her Texan citizens, by the congress of Coahuila and Texas, was not unconstitutional, because not made applicable to other parts of the State where the inhabitants were unacquainted with, and could not have appreciated its advantages.

The Governor of Coahuila and Texas was, under the provisions of the constitution and laws, authorized to appoint the superior judge of the district of Texas.

Congress having decreed "that during the approaching recess of congress, the executive may appoint provisionally the superior judge of Texas," the official tenure of the person appointed by the executive, did not terminate with the next meeting of congress; and it not being shown, that the party appointed did not continue in office for a year or more, the court cannot say that the commission did not determine correctly, in awarding him his salary for one year.

The law fixing the salary of the superior judge of Texas, and providing for its payment, in land, at the price of one hundred dollars per league, was not void, on account of its generality. In this respect, it was not peculiar, but conformed to other laws of more importance. It was in accordance with the custom, to leave the particular details of the object of the law, to be determined and carried out by the executive.

Neither was the commission to the officer, who issued the grant, void, because it left it to be determined by the commissioner, under the law and facts, how much land the applicant should receive.

The commissioner who issued the title, might supply a part of the original title which was lost, by adopting the *testimonio*.

An objection, that an original title was not filed in the General Land Office, within the time prescribed by the joint resolution, passed December 14, 1837, cannot be sustained by one whose rights did not accrue, until after such original title was filed in the General Land Office.

That a title was not written upon stamped paper, is an objection, going merely to the authenticity of the instrument, and may be supplied by proof, *aliunde*.

The receipt of the plaintiff, to the commissioner who issued his titles, though accompanied by the certificate of the Commissioner of the General Land Office, that he had received the titles described in such receipt, is not, of itself, evidence of the facts stated in the receipt.

The certificate of the Commissioner of the General Land Office, is not competent evidence to show the time when the said office was first opened, when closed, and when again opened.

See this case for an historical account of the organization of the Mexican government, and a review of the powers and functions of the State and Federal governments.

If title papers, and documents which were unnecessary, in order properly to determine the merits of the question to be decided in this court, have been offered and introduced in the record, the appellant should be taxed with the costs thereby occasioned.

APPEAL from Williamson. Tried below before the Hon. Nat. M. Burford.

The facts are stated in the opinion.

*T. J. Chambers* and *J. W. Harris*, for appellant.

*John Hancock*, for appellees. We assume, as a postulate, not open to controversy, that this court, in adjudicating a title emanating from the Mexican governments, are bound to take the same judicial cognizance and notice of the laws in force at the date of the grant, which they are of the laws of the Republic or State of Texas; they are not treated as foreign laws, nor required to be ascertained and determined, as foreign laws are, by a jury, upon proof by witnesses (Arguello v. United States, 18 How. Rep. 539; The United States v. Philadelphia and New Orleans, 11 Id. 609; United States v. King, 7 Id. 833.) See also, this doctrine broadly asserted in a report signed by chief justice Hemphill, and other distinguished jurists, in the convention which formed the State constitution. (Debates of the Texas convention, page 295.) The 1st section of the schedule of the constitution of the Republic of Texas, clearly enjoins judicial notice of the laws of the former government; and previously, in the "Plan of the Provisional Government,"

18th article, it is declared that all *grants, sales and convey-ances* of land, illegally or fraudulently made by the legislature of the State of Coahuila and Texas, located, or to be located, within the limits of Texas, are hereby solemnly declared null, void, and of no effect. After the change of government, how, except by judicial determination, could it be ascertained wherein, in what cases, and to what extent, the legislature of Coahuila and Texas, had illegally disposed of lands, by "grants, sales, or conveyances?" A power to interpret and construe, as well as to administer the laws and constitution, thus made of force, with reference to titles originating under them, must reside somewhere; and since the adoption of the constitution of the republic, no one has ever doubted but that it appertained solely to the judicial department, to which it is confided by that instrument. To assume, then, that the courts of the State have no power to interpret the laws of the former government, when adjudicating titles originating under them, overturns the well settled principle already discussed; and in effect expunges from the constitution of the republic, the 1st section of the schedule, and from the constitution of the State, the 20th and 21st sections of its general provisions.

In the case of Smith v. Power, 14 Tex. Rep. 146, the court say, in speaking of a grant kindred to the one under considera-tion in this, that it belongs to none of the usual class of grants. "The grant, to be valid, must within itself contain the essential elements of title." It will not be gainsaid, that the 12th Art. of the General Colonization Law, (Sec. 2, title 6, Mexican Const.,) expressly forbade more than eleven leagues being united in the same hands, and that this was a limitation upon the power of the State, as binding as the constitution itself; and to give validity to the title here offered, it must possess the ele-ments of title, and derive them from the "specific authority of a decree of the congress of Coahuila and Texas," as such a decree only could bring it within the recognized exception laid down in the same case, page 147. That decree No. 277, does

not support this grant, by specific authority, we will endeavor to show under another head.

That decree No. 277 is unconstitutional, we maintain is clearly shown by article 160 of the constitution of Mexico, and by the constitution of Coahuila and Texas, articles 32, 168, 170, 171, 181, and from 218 to 221. And the alleged necessity of that decree, in order to comply with article 192 of the constitution, is disproved by decree 136, page 151, laws of Coahuila and Texas, previously passed, and which met all the requirements of that article.

It is further insisted, that no such office, as that claimed to have been held by Chambers, was created by or known to the constitution, to which alone belonged the power of creating it. If it be so held, however, we insist that he was not legally appointed, because it is expressly provided, by Art. 201 of the constitution of Coahuila and Texas, that the judges, &c., shall be appointed by the congress, upon the recommendation of the governor. No other mode is provided for an appointment, in any case; and the legislature possesses no power to substitute another, even provisionally. If decree No. 277 was unconstitutional, all acts under it are null and void. (The State v. Delesdenier, 7 Tex. Rep. 76; Horan v. Wahrenberger, 9 Id. 313.)

The appellant read in evidence, a commission to him from the governor of Coahuila and Texas, which appears, on its face, to have been issued under decree 286, and follows the terms of that decree. He is appointed judge, *provisionally*. This term must be held in some way to qualify the attributes of that office, by imposing some limitation, either upon his rights and functions, or the period of time for which he was to exercise them : it could not have been of the former, and must of course have reference to the time. The words of decree 286, clearly import that the appointment was to be made only for the recess. The only words in the decree, calculated to aid us in the construction of the qualification, are words of time, "during the approaching recess." In construing language, it is sometimes

necessary to transpose words, to arrive with greater clearness and certainty at its meaning. If the decree be made to read thus, " the governor shall appoint provisionally during the approaching recess," &c., the meaning becomes too obvious for doubt, if any can exist as it stands. The constitution of Coahuila and Texas fixed the meeting of congress on the 1st January of each year, and we are to presume that it did so meet; at all events, that was the time when the recess expired, and with it the commission of judge. Chambers, then, could have been in office but little more than six months.

By the provisions of decree 277, the judge created by that law, was to receive as salary $3,000 per annum, to be paid with lands at $100 per league. Just forty-five days after his appointment, he applied to have a commissioner appointed, to extend titles to him in payment of his salary, and Lewis was appointed, as prayed for, to "issue to him titles according to the laws." This appointment gave the commissioner no jurisdiction over any lands, made certain by description, quantity, or any other significant words; and without this, his commission or authority, if worth anything at all, was worth too much, for it amounted to a delegation of the granting power generally. Nor was any mode pointed out, in his commission, by which he was to ascertain how much land he should issue titles for; and herein it was an incomplete and defective power, and incapable of being executed. If capable of being executed, it must have been executed strictly. This, we maintain, was not done, for the commissioner exceeded his authority, by granting Chambers double the quantity of land to which he was entitled, either by his (Lewis's) appointment, or the decree 277. In considering Lewis's appointment, and the manner of its execution by him, this court will regard it as a question of power, and that too on the part of a mere agent, in favor of whose acts no presumption is indulged, and which, like frauds, may be inquired into at all times. (Perkins v. Washington Ins. Co., 4 Cow. Rep. 645; Maryland v. Baltimore and Ohio R. R., 3 How. Rep. 534.)

Admitting for the sake of argument, that the power to

Lewis was complete, and that under it he had issued titles to Chambers for sixty leagues; in so doing, he would have exceeded his powers, and his act would have been void. (Stoddard v. Chambers, 2 How. Rep. 318; Mason v. Russell, 1 Tex. Rep. 721.) If, then, he issued titles to Chambers for thirty leagues, when he was only entitled, at most, to fifteen, under the law, his act was void. (Ibid.)

The paper, embracing the title to the land in controversy, offered and rejected in the court below, showed on its face that, before this land was granted, more than eleven leagues of land were united in the hands of the plaintiff, in contravention of a general law of the Union. The language of the 12th article of the National Colonization Law, passed 16th August, 1824, is clear and unambiguous in its terms. Its policy was endorsed, and its provision re-enacted into their State colonization law, by Coahuila and Texas, March 24, 1825, (Laws of Coahuila and Texas, page 19,) and its meaning and binding authority recognized on various occasions, by the congress of that State, (Laws of Coah. & Tex. pp. 281, 283,) and especially on the 15th of May, 1835, subsequent to the date of the concession in this case. (Laws of Coah. & Tex. pp. 301, 302, 303.) The constitution of the Republic of Mexico (§ 2, of title 6,) says, *each one of the States is obliged* " to obey, and cause to be obeyed, the constitution and general laws of the Union," &c., thereby making the general laws of the Union equally binding with the constitution itself, upon all the States, differing from its provisions only in the mode of their amendment and repeal. That this law of 18th August, 1824, was always regarded of force in the States, is shown most clearly by the communication of the State to the federal congress, to be found on pages 301, 302, and 303, Laws of Coah. & Tex.; and that it was so, we had never heard doubted, up to the argument of this case. A recurrence to this portion of the argument of the appellant himself, before this court, brings to our mind another proposition put forth in his argument, equally new and startling, that the Mexican States, previous to the adoption of the constitutive Act and

federal constitution, in their powers, faculties and relations, were independent sovereignties, analogous to the colonies which afterwards formed the States of the North American Union; and as such, in them severally resided the right of eminent domain, and the power to dispose of the lands within their limits. That such was not the fact, is proven by the constitution of Mexico, for it emanates from the "sovereign executive power," as ours from the "people of the United States." It is apparent, from the 2d sec. of the 1st tit. of the Mexican constitution, that up to that time, the political subdivisions of the country known at the time of its adoption, were only those named in that section. The States are created by the 5th Article. We will not pursue this digression, elicited by a portion of the appellant's argument before this court, because it is unimportant whether in this particular he be right or wrong. It is abundantly shown that the States recognized the binding authority of the general laws, so far as they support our objections to the appellant's title, and this is enough for our purpose.

1st. We assume that, according to law, no more than eleven leagues of land could be united in the same hands.

2d. That the grant to Chambers, of more than that quantity, was in contravention of that law, and void. (Mason v. Russell, 1 Tex. Rep. 721.)

3d. That decree 277, if constitutional, was not such "specific authority" for such a grant, as to bring it within the "exception" laid down in Smith v. Power.

4th. That the power to Lewis to issue titles, was defective and incomplete, and incapable of execution; if not, that he exceeded his authority; and in either case, his acts under it are void.

All these propositions we have discussed, except the 3d, and we will now proceed to maintain it. That the limitations upon the powers of the States, in making grants or sales, contained severally in the 4th and 12th articles of the law of the 18th August, 1824, differ only in the objects and persons to which

they apply, and the rule in regard to a violation of the one must be the same as in the other. In the case of a grant within the border or littoral leagues, the approbation of the supreme executive power of the federal government, was an essential requisite. Under the 12th article, it was equally essential to a party's capacity to receive, and to the power of the State to grant, that there should not be united, in the hands of the beneficiary, either before the grant, or by its effect, more than eleven leagues of land. This court has decided, that the assent referred to is essential to the validity of a title within the border or littoral leagues. We regard it, then, as an inevitable corollary, that any act, by which more than eleven leagues are united in the same hands, is invalid and void. In the former case, a presumption of such assent might be raised to weaken the proposition; in the latter, it could not be thus affected by anything, either presumed or proved, short of an absolute repeal of the law. The question then is, does Decree 277 disclose or import such "specific authority" for this grant, as will bring it within the recognized exception in Smith v. Power, 2 Tex. Rep. 57? The title of Decree No. 277 is, "A plan for the better regulation of the administration of justice in Texas." As one of the means of doing so, a judge is provided, and a salary established for the office, which is to be paid with land, at a certain rate. It conceded no land to the officer to be appointed, it directed no functionary to do so, and conferred no authority for such a purpose. It prescribed no time or mode in which it was to be done, and designated no land, by quantity or description, for which titles were to issue. Had it been the intention of this decree, that lands should be granted to one person, in a greater quantity than eleven leagues, it discredits the intelligence of its framers, to suppose they could have thought it sufficient for such a purpose. Instead of being a "specific authority" for such a grant, it is no authority at all; and we are relieved from the necessity of discussing the distinction, in many cases difficult, between what is, and what is not, specific. Article 32 of the Decree of 26th March, 1834, is an

33

example of what is specific, and stands in too violent contrast with Decree No. 277, to allow us fairly to suppose that it ever contemplated a like purpose. This latter decree varies the law in relation to grants, or sales of land, in no particular; it imposes no new conditions; it removes none which existed before. It is no "specific authority" for a grant of any sort, least of all, for one against the laws of the Republic, the laws of the State, and the settled policy of both.

In construing laws in seeming conflict, courts favor that construction which will give effect to both. As the Decree 277 does not provide that Chambers shall *receive* his salary in land at a certain rate, may we not rather insist, that this decree intended to provide a mode of securing the prompt payment of his salary or, in other words, a fund, out of which he should be paid, by sales, (as had been the law and custom theretofore,) than suppose that, in this case, for no apparent reason, it intended to disregard, as we have just said, the laws of the Republic, the laws of the State, and the settled policy of both?

*A. J. Hamilton*, also for appellees.

ROBERTS, J. This is an action of trespass to try title, brought by the appellant against the appellees, to recover a tract of eight leagues of land, lying at the foot of the mountains on the east side of the Colorado river, in Travis county, which is set out in the petition by metes and bounds. The appellant claims to have derived a title to this tract of land, as well as to other tracts, from the State of Coahuila and Texas, in payment of a year's salary as "Superior Judge of the Circuit of Texas."

The appellees filed the plea of not guilty, as well as other matters of defence.

At the trial, the appellant read in evidence his commission, as such superior judge of Texas, dated at Monclova, 16th June, 1834, which is signed by the Governor, Villasenor, and recites hat "I have thought proper to appoint him provisional Superior "Judge of the Circuit of Texas, for the administration, in all its

"extent, according to the jury law of the 17th of April "past."

Article 192 of the constitution of the State of Coahuila and Texas, provides that " one of the main objects .of the attention "of Congress shall be to establish the trial by jury in criminal "cases, to extend the same gradually, and even to adopt it in ".civil cases, in proportion as the advantages of this valuable "institution become practically known." (Laws Coah. & Texas, p. 339.)

To comply with the obligation imposed on them by this article, the Congress, by Decree No. 277, enacted—" Art. 1. Texas "shall be formed into one judicial circuit, which shall be denomi- "nated 'the Superior Judicial Circuit of Texas.'"

"Art. 2. All causes, civil and criminal, shall be tried by "juries, in the manner and form prescribed by this law."

"Art. 17. To be a superior judge, it is required that he be a " citizen, in the full exercise of his rights, over twenty-five years "of age, a lawyer by profession, and a man of probity and " science. He shall be appointed by the Congress on the nomi- "nation of the governor *en terna;* and he cannot be removed "from office, except from some cause legally manifested and "proved. His salary shall be three thousand dollars per " annum.

"Art. 18. In case the judge appointed may not be acquainted "with both the legal idioms of Texas, he shall appoint an in- "terpreter, whose salary shall be one thousand dollars per " annum."

"Art. 239. The salaries established by this law shall be paid "the first year, with vacant land situated within the judicial " circuit, and at the rate of one hundred dollars for each sitio."

This decree was signed, &c., on the 17th of April, 1834. (Laws Coah. & Texas, p. 270.) One of the very last acts of this Con- gress, was the Decree No. 286, of the 5th of May, 1834, which provides that, " during the approaching recess of Congress, the " executive may appoint provisionally, the superior circuit judge "of Texas, mentioned in the law relative to jurors, without

"adhering to the provision of Art. 17th of said law, in respect "to making that appointment." (Laws Coah. & Texas, p. 276.)

The appellant, after having read his said commission, offered in evidence a certain paper, purporting to be a translated copy, duly certified, from the General Land Office of the State of Texas, of titles of possession of several tracts, (the one sued for included,) amounting in all to about twenty-nine and a half leagues of land. It contains: 1st. The application of the appellant to the governor, 29th July, 1834, as follows: "The "citizen licentiate, Thomas Jefferson Chambers, superior judge "of the Superior Circuit of Texas, with due respect before your "excellency, I represent that, desiring to proceed to my circuit, "with the object of entering upon the discharge of the duties of "my office, and it being necessary to arrange the mode of receiv- "ing my salary, in order to subsist, which salary I am to receive "in lands, according to the law relating to the matter, I request "your excellency to deem proper to appoint a commissioner, "and in his default, any of the alcaldes of Texas, to issue the "corresponding titles, and I will receive thereby favor and "justice."

2d. The decree of the governor thereon, as follows: "Let "the petition be granted, and for that purpose, I appoint the "citizen, Ira R. Lewis, and in his absence, any alcalde of the "municipality, in whose jurisdiction the land for which the peti- "tions may be, to issue the corresponding titles to him, accord- "ing to the laws. Let there be given to the party interested a "copy of his petition, and of this decree, that by applying with "it to the commissioner, the consequent effects may result." Copy given July 30th, 1834.

3d. A designation of the lands to the commissioner by appel- lant, on the 31st July, 1834, next to the last tract of which was one of "eight leagues on the eastern margin of the river Colorado, near the foot of the mountains."

4th. A reference to the empresario for his consent, and con- sent by Robertson, to locate the lands within the colony of the Nashville company.

5th. Application to the commissioner, by the appellant, for possession and title to the tract selected on the Colorado river, at San Felipe, June 18th, 1835.

6th. The title issued by I. R. Lewis, 20th June, 1835, at San Felipe, being the last one issued for the several tracts. It recites the authority and object of his commission ; the designation of the land by appellant; that it is vacant; that he had had it surveyed scientifically, setting out the boundaries of the survey ; that he placed and put appellant in possession, real and true, of the aforesaid land, and granted and conferred the same to him forever, &c.

7th. Order of J. P. Borden, commissioner of the General Land Office, to Ira R. Lewis, to deliver over to Gen. Chambers the original titles that belong to the General Land Office, to be by him delivered to the said Borden, in accordance with the joint resolution, passed Dec. 14th, 1837. This order was dated at the city of Houston, March 30th, 1839. (The joint resolution referred to, provides "that it shall be the duty of every person "or persons, who may have in his or their possession or control, "any titles or documents whatever, which relate to lands, and "which by the laws now or hereafter (heretofore) existing in "Texas, have been and are considered 'archives,' to deliver the "same to the commissioner of the General Land Office, on his "order, within sixty days after the final passage of this act.") (Hart. Dig. Art. 1835.

8th. The report of the said Ira R. Lewis to the said Borden, of the titles belonging to the appellant, including the one now in controversy, and reciting their delivery to the appellant, in pursuance to said order ; dated at Matagorda, Jan. 20th, 1840.

9th. Certificates of S. Crosby, commissioner of the General Land Office, and of the Spanish clerk, authenticating the foregoing, as copies of the originals on file in the office, dated at Austin, November 4th, 1856.

10th. Receipt taken by Ira R. Lewis, from the appellant, reciting the delivery of the certain titles, the one in controversy being included, dated January 20th, 1840, purporting to be a

duplicate; and certificate of John P. Borden, that he had received in his office the documents set forth in the receipt, 7th February, 1840.

The appellees objected to the introduction of said translated copy, the receipt and the certificate, on the following grounds:

First. Because the Decree No. 277, under which the plaintiff claims his right to the concession, was contrary to the constitution of Coahuila and Texas, and therefore void.

Second. Because the said Decree No. 277, did not authorize any concession, to the plaintiff, of the lands which he claims, or any other lands.

Third. Because the said concession is for no special amount of land, and is inoperative and void.

Fourth. Because the titles presented and claimed under the concession, comprised more than eleven leagues, and showed, in fact, that more than eleven leagues had been issued to him under said concession, prior to the issuance of the title under which the land in controversy is claimed.

Fifth. Because the said title was not filed in the land office, and is not on paper of any stamp or seal.

These objections were sustained by the court, and "the said "translation, copy, receipt and certificate, were respectively "excluded from the jury."

Appellant also offered to read in evidence the depositions of Ira R. Lewis, the commissioner, and of Valdez, and Cazneau, assisting witness, to establish the execution of the title, and other facts in relation thereto, which, upon objection, were also excluded by the court. There were various other matters in the bill of exceptions, which it is unnecessary to refer to.

The first question which presents itself, under these exceptions to the evidence offered, is, did the congress of Coahuila and Texas have the power to grant appellant the land in controversy, being the last tract granted, of thirty leagues, received by him for one year's salary as Superior Judge of Texas. It is contended that it did not, because, first, the decree granting it was in contravention of the 12th Art. of the national coloni-

zation law; and secondly, the congress of the State had no power to create such an office or tribunal; and had no right to pass the jury law, which applied to Texas only, and not to Coahuila; and had no power to delegate to the governor the appointment of the judge.

The 12th Art. says, "It shall not be permitted to unite in "the same hands, with the right of property, more than one "league square of land suitable for irrigation, four square leagues "in superficies of arable land without the facility of irrigation, "and six square leagues in superficies of grazing land." (1 White's Recopilacion, p. 602.)

Art. 160 of the constitution of the United Mexican States, says, "The judicial power in each State shall be exercised by "the tribunals established by their constitutions; and all causes, "as well civil as criminal, which originate in such courts, must "be therein finally disposed of." (Id. 408.)

The constitution of the State of Coahuila and Texas provides, that—Art. 171. "The laws shall regulate the order and formali- "ties to be observed in suits at law. These shall be uniform in "all the courts of justice and tribunals, and no authority can "dispense therewith." Art. 32. "The exercise of judicial "power shall reside in the tribunals and courts of justice estab- "lished by this constitution." Art. 201. "Both magis- "trates, and fiscal agents, shall be appointed by congress, on "nomination by the executive." (Laws Coah. & Tex. 313.)

These are the provisions, mainly relied on, to establish the position that the congress of Coahuila and Texas had not the right to grant this tract of land; and they are presented in connection here, because the importance to be attached to most of them, depends upon the power belonging to the federal government, and to the State; and should be considered with reference to the division of the powers of government between them.

In a confederation of States, whose bond of connection is itself a government, great difficulty must always be found in the attempt, which must be made, to separate and define the

powers and duties to be performed respectively, by the federal and State governments thus established, so that each may fill its appropriate sphere. Such federal government must usually be so framed as to accomplish two leading objects,—à unity of action by all the States, as one government, in its foreign relations; and harmony between the States, in the full exercise of their reserved rights. This was attempted in the formation of the "Constitution of the United Mexican States."

After a series of desultory struggles for independence, without organization, and often without concert, Iturbide, early in 1822, at the head of the army and revolutionary forces, dislodged the Spanish authority under the "plan of Iguala," which contemplated the independence of Mexico as a limited monarchy, under a resident king, Ferdinand VIII., or some of the members of his family. To carry out this plan, Iturbide victoriously entered the capital, organized a junta of thirty six members, by whom a regency of five persons was chosen, of which Iturbide was President. Thus organized, they assumed the control of public affairs, and proceeded to convoke a cortes, or legislative assembly, composed of representatives to be elected by the people of the provinces, in the proportion of one for every fifty thousand souls. This body convened in the city of Mexico, on the 24th February, 1824; and with the provisional executive, assumed supreme authority over the whole country; which continued to be exercised in some shape or other by the central power at Mexico, until Iturbide was dethroned from his usurped authority, the representatives of the provinces (whose body had been dissolved by him) had been re-convened, and the formation of separate State governments under the constitutive Act of the Federation, which was adopted by the central government of Mexico, on the 31st of January, 1824. (See Poinsett's Notes on Mexico, 253 to 288; 1 White's Recopilacion, p. 380.)

This constitutive Act, made by the central government, then composed of an assembly of representatives from the provinces, and the provisional executive, Victoria, Bravo and Negrete,

established the Mexican nation, (Art. 1, 2, 3;) and declared, in Article 6th, "its integral parts are free, sovereign and inde-"pendent States, in so far as regards exclusively its internal "administration, according to the rules laid down in this Act, "and in the general constitution." It named the provinces that should constitute States, and provided for the formation of their constitutions by them, after the general constitution should be framed and adopted; and in the mean time, permitted their legislatures to provisionally organize an internal government. (White's Recopilacion, pp. 375 and 378.) The same power adopted the "constitution of the United Mexican States," at Mexico, 4th October, 1824; which went into regular operation, with Victoria as president of the republic, on the 1st day of January, 1825. (Mayer's Mexico.) In this instrument it is said, (Art. 161,) each State is bound to organize its government agreeably to the constitution and constitutive act, and to cause the constitution and general laws and treaties to be observed. (Id. 408.) In addition to the exclusive legislative powers enumerated and conferred upon the general congress, the general power is given, accompanied with a limitation, (31.) "to dictate all laws "and decrees which may conduce to accomplish the objects "spoken of in 49th Art., *without intermeddling with the interior* "*administration of the States.*"

"Art. 49. The laws or decrees which emanate from the gene-"ral congress, shall have for their object:

"1st. To sustain the national independence, and to provide "for the preservation and security of the nation, in its exterior "relations.

"2d. To preserve the federal union of the States, and peace "and public order in the interior of the confederation.

"3d. To maintain the independence of the States among "themselves, so far as respects their government, according to "the constitutive act and this constitution.

"4th. To sustain the proportional equality of obligations and "rights, which the States possess in point of law." (Id. 393, 395.)

It is also provided that, (Art. 165,) "Congress alone has the "right to interpret the constitution in doubtful cases." (Id. 410.)

Under the rights thus accorded, the congress of Coahuila and Texas established a provisional State government at Saltillo, August 15th, 1824; and afterwards adopted a Constitution of the State of Coahuila and Texas, on the 11th of March, 1827, in which, after asserting the freedom and independence of the State, it is declared that: (Art. 4.) "In all "subjects relating to the Mexican confederacy, the State dele-"gates its power and rights to the general congress of the same; "but in all that belongs to the internal government and adminis-"tration of said State, it retains its liberty, independence and "sovereignty." (Laws Coah. & Tex. 313.)

This instrument proceeds to institute and organize the respective departments of a representative republican State government; asserts that "all kinds of vacant property within its "limits, and all intestate property without a legal successor, "shall belong to the State," (Laws Coah. & Tex. 313;) and declares, that its "congress shall have power (Art. 97,) to enact, "interpret, amend or repeal the laws relative to the adminis-"tration and internal government of the State, in all its "branches."

This will suffice to show that the limits of power, to be exercised by the federal and State governments, respectively, was attempted to be defined, so as that each should be a government of absolute powers within its appropriate sphere. It may not be very accurately done, but that such was the endeavor of its framers, we have the express declaration of the committee appointed to draft the constitutive act, in their report of 15th November, 1823, (see Notes on Mexico, 297,) and in the report of the general congress that framed the constitution. (1 White's Recopilacion, p. 381.) In the latter, it is said, "the "federal Republic was the necessary fruit of these discussions. "The systematic tyranny of Spanish mandarins, could alone "induce them to govern so immense a territory by the same

"laws, considering the enormous difference of its climates, dis-
"positions of its inhabitants, and their consequent influence.
"What relations of convenience could possibly exist between the
"burning soil of Vera Cruz, and the frozen mountains of New
"Mexico?" &c. "These are the advantages of the federal sys-
"tem. It gives each people the right of selecting for itself laws
"analogous to its customs, locality, and other circumstances,"
&c. (Id. 383.)

From the same source we learn, that the model which they
sought to follow, was the United States of the North. But
however similar to that in general form and outline, there is a
most marked difference in the result,—that is, in the actual
government put in operation under its form. A due apprecia-
tion of this difference is important in this case. It is involved
in the mode adopted in the Mexican system of government, of
correcting the infractions of their constitution, both federal and
State. In this, we find striking features of the old colonial sys-
tem of government, engrafted upon the new system; and that
too, more prominent and controlling in practice than in theory.
The different provinces or departments of Mexico, had been
governed for more than a century by viceroys, intendants, cap-
tains-general, and governors, with no very permanent territorial
organization, and often, if not generally, with an admixture of
civil and military rule, in imitation of the Roman policy (1
Humbolt, 199 to 221; Notes on Mexico; 1 White's Recopila-
cion, p. 237.)

There was a regular gradation of power, from the highest
to the lowest officer in the country. The orders of the superior
were the law to the inferior. This may be illustrated by what
is said of the viceroy: "Subjects have no obligation to investi-
"gate or know the orders and instructions of a secret nature,
"which are given to the viceroys, in which bounds are put to
"their power, for, if they do not obey them, they are subject to
"reprehension and punishment; but what they perform must
"be sustained, because they are in quality of factors or substi-

"tutes to royalty, for whose actions, he who named them is "accountable," &c. (1 White's Recopilacion, p. 367.)

The tenure by which every officer held his position, of whatever grade in the scale, was a direct personal and official responsibility to his superiors. (Id. 412; Decree of the Cortes, 1811.) There were aids and checks, in the shape of a council of some sort, attached to the administrative officers, and over which they generally presided. (Notes on Mexico, 115–16.)

These principles of government were infused into the whole Mexican system. It confided to the president the plenary powers of a strong executive. It is acknowledged, by the committee who drew up the constitutive act, that they had given him powers "which have never yet been given to the executive "of any central system, nor sometimes even to moderate mon-"archies." (Notes on Mexico, 30.) He had power "to make "regulations, decrees and orders for the better observance of "the constitution, constitutive act and general laws." (Art. 110, § 2.) He was even given a supervision over the courts. (Id. § 19.)

A permanent council of government was formed of half the Senate, a material part of whose business it was to "watch "over the observance of the constitution, constitutive act and "general laws, keeping a record of all incidents relating to this "subject." (Art. 116.) Congress was given, not only the right to interpret the constitution, in doubtful cases, but to enact laws to punish those violating it. (Art. 164–5.) Tribunals were established to try and punish the higher officers for infractions of the constitution. Even the governors of the States were subject to be tried before it, "for infractions of the constitution, the laws of the Union, or orders of the president of the federation, which are not obviously contrary to the constitution and general laws of the Union, and also for the publication of the laws or decrees of the legislatures of their respective states contrary to the same constitution or laws. (Art. 38, 40, 137, § 5.)

The same features are to be found in the constitution of Coahuila and Texas. (Arts. 27, 127, § 2—142, 219, 113, 2d—98, §§ 1, 148, 97, 153.)

It was made the respective duties of two bodies in the State, to wit, the permanent deputation, and the executive council, "to watch over the observance of the constitutive Act, constitu- "tion and general laws of the Union, and the private laws of "the State, in order to give notice to congress of the violations "it may have noticed." (Art. 98, 127.)

Thus, in the Mexican system, ample precautions were devised to detect any violations of their constitutions, and ample means furnished for an immediate correction—not by the slow process of adjudication of rights in a court, for their courts were bound to execute the laws, without question as to their constitutionality, (Art. 172.)—but by the direct and immediate exercise of the supreme authority, wherever it might be vested, over the subject; and by establishing and enforcing the direct responsibility, personal and official, of the officers of government, who were concerned in its violation. It was not their policy to permit unconstitutional measures to be adopted, and stand as of force, to be executed, and to be complicated by apparent rights growing up under them. A notorious instance of the exercise of this power, was a law of the general congress of the 24th of April, 1835, annulling a decree of the congress of Coahuila and Texas, which authorized the sale of four hundred leagues of land to be colonized, and declaring that "the alienations of pro- "perty made in pursuance of said decree, are void and of no "effect." (Arrillaga, 1835, p. 145, translated Rockwell's Sp. & Mex. Law, 616.) That this was not only the theory, but the practice of the government, is fully evidenced by the laws and decrees of the general congress interpreting the federal constitution, restricting the operations of parts of the constitution of a State, and annulling laws and decrees enacted by the States. (Collection of Decrees, vol. 3, p. 134; vol. 4, pp. 66, 77; Arrillaga, 1835, pp. 122, 145.)

Instances are to be found, also, where the congress of Coahuila and Texas suspended, and even annulled previous laws, because of their want of conformity to their constitution.

The fact is not to be overlooked, that very many of the principles of the Mexican constitutions were theoretical importations, with the practice of which no class of their people were habitually familiar, borrowed from the institutions of the United States of the North; where they were fully and critically understood, simply because they were founded upon the habits, conduct and opinions of a people ever restive under oppression, jealous of their rights, and formed, matured and embodied into living activity, by the heroic struggles of themselves and their ancestors, continued and persisted in, through a series of generations.

These views, it is believed, will enable us the better to consider the Mexican system of government, as to its powers, duties, and obligations, in all its departments, in a point of view from which the Mexicans, who framed it and acted under it, did regard it. And that is important; for *that* is the actual government which they (and not others) understood themselves to be founding and carrying into operation.

The fact, then, that a constitutional provision, or a law, or class of laws, was subjected to these ordeals of supervision and abrogation, and was suffered to remain in force long enough for rights to be acquired under it, is a strong and potent circumstance in favor of its validity, as a part of their system of government, as they understood it.

The general government, in recognizing the State of Coahuila and Texas, as organized under its constitution, conceded the right of internal administration, as effectually as though the States had first been free and independent sovereignties, and had by joint concessions and agreements, formed the federal government.

The constitution of that State, after asserting its independent sovereignty, except as to the powers delegated to the general government, assumes to claim that "all kinds of vacant

"property within its limits, and all intestate property without "a legal successor, shall belong to the State," (Art. 15.) and that the congress of the State shall have power to "enact "what is proper for the administration, preservation and aliena- "tion of the property of the State." (Art. 97.) Here is an open, express claim of right to the vacant domain in the State, with the full power of disposition. These provisions of the constitution of the State, are not annulled or controverted in any way by the general government; nor was any law of the State, assuming this right, sought to be controverted by the federal authorities, until April, 1835, after the weight of the supreme executive power, and other inherent defects of its or- ganization, had given the government a direction, with an irre- sistible drift, towards centralism, which was carried to its entire consummation under the "Plan of Toluca," in 1836, by the adoption of the "Central Constitution." (Mayer's Mexico, 399; 1 White's Recopilacion, p. 626.) This law of the general congress, annulling the law of the State making a disposition of four hundred leagues of land, and prohibiting the border and littoral States from selling land, was protested against by the congress of the State, as being itself unconstitutional. They say, "the alienation of these lands has been an extraordinary "measure of finance, the object of which was to give vitality to "the State, when all the avenues of the ordinary branches, that "form its public treasury, were obstructed." To destroy this measure by a single blow, by provisions impracticable, com- promitting, and so extensive in their effect, is the same as to annihilate the political existence of the State; to attack the sovereignty, stipulated in the federal compact, in respect to the internal administration of everything pertaining to it, throughout the whole extent of its territory. It is destroying the federal compact. (Laws Coah. & Tex., 303; see also Id. 288.)

The general congress bases its action in this measure, upon the 7th Art. of the general colonization law of 18th August, 1824, which reads as follows: "Until after the year 1840, the "general congress shall not prohibit the entrance of any

"foreigner as a colonist, unless imperious circumstances shall re-
"quire it, with respect to the individuals of a particular nation."
This, in connection with the well known history of the times,
renders it obvious, that the true object in view, was not to at-
tack the right of property to the vacant domain in the State,
but to control, if not altogether to prevent, the further coloni-
zation of the country by the North Americans. The unyield-
ing independence, desperate valor, and high intelligence of
colonists of that race, had excited in the minds of the federal
rulers of Mexico, serious apprehensions of an ultimate dis-
memberment of their territory; which, indeed, were afterwards
verified at San Jacinto. As early as April 6th, 1830, a decree
of the general congress provided that, (Art. 3d.) "The go-
"ernment shall appoint one or more commissioners, whose duty
"it shall be to visit the colonies of the frontier States; *to con-*
"*tract with the legislatures of said States for the purchase by*
"*the nation, of lands* suitable for the establishment of new colo-
"nies of Mexicans and foreigners; to enter into such arrange-
"ments as they may deem proper, for the securitiy of the Re-
"public, with the colonies already established," &c. (Rockwell's
Sp. & Mex. Law, 621.)

Although this measure was never carried out, it evinces the
policy under which the general government acted, and contains
a plain and unequivocal recognition of the full right of the
State, to the vacant domain in her limits, and of its right to
dispose of it. The State, being the owner of the lands, had
a right to donate or sell them at discretion, unless she was re-
stricted by some paramount law; and this brings us to the
consideration of the 12th Art. of the general colonization law,
which fixes a limit to the amount of land to be united in the
same hands.

This Decree No. 72, was enacted on the 18th of August,
1824, by the constituent congress of Mexico, before the State
governments were organized under their constitutions; and
emanating from the supreme power, it was in force in all the
provinces or States. The constitutive Act of the same con-

gress, provided for a provisional government in the States, and enjoined upon them, that "in the mean time" (that is, while thus acting, and before the adoption of their constitutions,) "they must see that the laws actually in force be observed."

In 1825, the State of Coahuila and Texas, acting under its provisional government, enacted a colonization law, "to aug-"ment the settlement of the territory, to advance the raising "and increase of stock, and progress of arts and commerce, in "conformity to the constitutive Act, the constitution of the "Republic, and the basis established by decree No. 72, of the "general congress." (Laws Coah. & Texas, 15.)

Under this general basis, and treating it merely as a general basis, the State proceeded to establish the details of a system adapted to its local condition. It permitted empresarios to acquire and hold, at the same time, as much as forty leagues, but required them to alienate the excess over eleven leagues, within twelve years; and provided that, should they not do so, "it shall be done by the respective political authority, at pub-"lic sale, delivering the proceeds to the owners thereof, after "deducting the costs of sale." It permitted lands generally to be sold to "Mexicans and them only," not exceeding eleven leagues, subject to the condition of cultivation in six years. (Art. 12, 13 and 24.) The State of Tamaulipas also, in 1826, established a colonization law, in which it allowed empresarios to acquire as much as forty leagues, and provided no means of diminishing or restricting the amount, except by the right it gave new colonists to condemn and appropriate, at valuation or otherwise, "lands of which the proprietor makes no use." (Laws Coah. & Texas, p. 354, Art. 15, 28, 29, 30.)

The restriction in the general colonization law, was not to the specific amount of eleven leagues of land, whatever might be its quality; but to one league if it was irrigable land, to four if arable, and to six if pasture; making eleven in all, of the different sorts.

These States, in the north-eastern portion of the Republic,
34

regarding this part of the law as a matter of internal administration, and seeing that this division of lands was not adapted to the greater portion of their territory subject to colonization, did not adopt it in the details of their systems, but granted eleven leagues, without reference to quality, further than in relation to the price to be paid for it.

It is to be observed also, that the very terms in which this description is couched, (in Decree 72, "It shall not be permitted to unite in the same hands, with right of property," &c.,) implies some discretionary regulations to be adopted by the States, as to the time and means of accomplishing the general object of the restriction, which was to prevent the monopoly of waste lands, and to condense the settlement of the country, as the increasing number of colonists might require it. The States were enjoined not to unite in the same hands, "with right of property, more than," &c.; that is, with uncontrollable right of property. It seems to contemplate that more land may accumulate in the same hands; but if so, it shall not be held in vast waste and unoccupied tracts, so as to impede or hinder the colonial settlements; and the States shall see to that. This policy, in all its parts, as here developed, is plainly indicated in the previous colonization law of 1823. (Rockwell, p. 618, Art. 11–19.)

The means adopted by Coahuila and Texas, to secure the general object of this restriction, as to those who, under her system, would most probably acquire more than eleven leagues, the empresarios, was to give them ample time, (twelve years,) within which to dispose of the surplus. There were portions of the general colonization law, which did relate to matters pertaining particularly to the federation, as the colonization of the littoral leagues; the introduction and naturalization of foreigners; payment of army, &c., as recognized by both the State and federal governments. But as to this restriction of quantity, after the full organization of the State governments, it was recommendatory, pertaining to the internal administration of the State, and subject to be controlled, to suit the local

condition of the respective States. Had it not been so regarded by the general government, these material departures, which were all known, would have met with prompt reprehension and correction. Nor are we left to mere construction to arrive at the conclusion, that the State had the right to modify or repeal the previous laws which pertained, and so far as they did pertain, to private rights of property, necessarily included in the internal administration of the State.

The constituent congress of Mexico, that framed both the constitutive Act and constitution, in answer to an inquiry made by the State of Vera Cruz, as to what laws a State had the power to dispense with, say that "The congresses of the States "have the power to dispense with every class of laws, except "such as concern the general interest (or powers) of the federation." " Que los Congresos de los Estados pueden dispensar toda clase de leyes que no sean del resorte general de la federacion."

In 1834, the State, finding that the colonists came to the country upon their own responsibility and expense, and were really for the most part not brought by the empresarios, and therefore, considering the large grants to empresarios an unnecessary gratuity ; and also finding that eleven league grants were procured by Americans of the North, under powers of attorney from and in the name of Mexicans, changed her policy, and assumed to colonize her vacant territory by a direct sale of her lands to both foreigners and Mexicans, who might emigrate to the country. (Decree No. 272, Laws Coah. & Texas, 257.) In this Decree it was provided, "that the same "person shall not be permitted to purchase more than two hun- "dred and seventy-five millionadas, (eleven leagues,) and no cor- "poration or company shall be allowed to purchase." (Art. 11.)

Here again, is a departure from the literal restriction in the 12th Article of Decree No. 72, and no complaint is made of it. The whole scope of this new law shows it to have been adopted as a measure of revenue, to sustain the exhausted resources of the State, as well as of the settlement of the country.

Even admitting that it was a matter pertaining to the province of the federation, as to how much land the State should give or sell to a foreign colonist, that could not control this case ; for the act under which appellant claims, was not a part of a colonial system, but an appropriation of the means of the State, to pay one of its officers for services to be rendered by him. If the State was the full owner of lands within her borders, such a disposition could certainly not, of itself, interfere with the rights of the federation, the land not being shown to be located in the littoral and border leagues. We are of opinion,. then, that the 12th Article of the general colonization law constituted no barrier to the acquisition, by appellant, of more than eleven leagues, under Art. 17 and 229 of Decree 277, under which he claims the land in controversy.

Had congress a right to create such an office or tribunal, and pass the jury law, to be executed by it, and to delegate to the governor the right to appoint such officer ?

The constitution provides that congress shall have power to create, suspend, or abolish, the public offices of the State ; assign, diminish, or augment their salaries, recesses or labors, (Art. 97,) and also that "the inferior courts of justice shall "continue in the manner and form that shall be required by "law, until, in the judgment of congress, the State rents permit "the establishment of learned judges, who shall be appointed in "each district."

The erection of this tribunal was evidently contemplated, and it was substantially left to congress to determine when the ability and the interest of the State required its establishment. The objection to it, that in the administration of the jury law, in Texas alone, uniformity in the order and formalities to be observed in suits at law, would be destroyed, would be a potent one, if considered abstractly, and understood in a sense in which it would be used by a people perfectly familiar with constitutional government. It must, however, be taken in connection with Article 139. "One of the main objects in "congress shall be to establish the trial by jury in criminal

"cases, to extend the same gradually, and even to adopt it in "civil cases, in proportion as the advantages of this valuable "institution become practically known."

When this constitution was adopted, in 1827, it was well known that a large and growing class of citizens had settled in Texas, who were ardently attached to the right of trial by jury. Among them, it was very proper for it to be established immediately. The Mexicans were unacquainted with it, and the great mass of them doubtless did not appreciate its advantages, and might not choose to encourage its adoption. They were largely in the majority. The two people spoke different languages, and for the most part lived in separate communities. Surely, that construction of this clause should be indulged, if at all reasonable, which would start the institution under favorable auspices, so that its advantages might be exhibited and gradually become known to all. These clauses, as well as every other, must be read, not as an abstraction, but by the light thrown upon them by the condition of the people to be governed by them.

The Article in the constitution (290) which provides for the appointment of magistrates and fiscal agents by congress, upon the nomination of the governor, has immediate reference to those who should compose the Supreme Court of the State, which was organized. There is no special mode pointed out for the appointment of the learned judges of the district, when it should become proper for congress to establish them. (Art. 193.) It is provided, however, in Art. 113, that the governor "shall appoint, agreeably to the constitution and laws, all "officers of the State not chosen by the people, or otherwise "provided by law." And we have seen, that it was provided by law, that this appointment of the superior judge of the district of Texas, should be made by the governor.

Texas, at the time these laws were passed for her benefit, was peculiarly an object of attention, both to the State and federal government. A convention had been held, her grievances and wants had been made known ; one of her wisest and

best citizens, had gone on a mission to the Mexican capital, to seek there relief, by giving her an independent position as a State in the federal union, and was then suffering a protracted incarceration for her sake. If, under these circumstances, the watchful supervisors and correctors of the infractions of the constitution, should have failed to detect any defect, if any there be, in the validity of these laws, in establishing the office, appointing the officer and paying him in lands, and he accepted and assumed the office, and performed its duties under a regular commission from the governor, and received his compensation, without his right to exercise the office ever having been contested by any legal authority, during the term of his service, it might be difficult to discover upon what principle he could collaterally be deprived of it.

The next question presented, under the exceptions to the evidence, is, that both the law and the commission, under which appellant claims, are too general and indefinite to authorize this grant of twenty-nine and one-half leagues of land.

The law fixes the annual salary at three thousand dollars, and stipulates for its payment in land, at one hundred dollars a league, out of the vacant lands in the district of Texas. It did not, in detail, prescribe the steps to be taken, by which the title was to be obtained. In this respect, the law under consideration was not peculiar; for an examination of the legislation of that period will show, that measures of much more importance than the granting of thirty leagues of land, were adopted in a few short general sentences, leaving the particular details of the object of the law to be determined and carried out by the executive, under the provision of the constitution, which requires that the governor shall see that "the constitutive Act, the federal and State constitutions, and "orders of the federal government and of the congress of said "State, be fulfilled, issuing the proper orders and decrees for "their execution." (Laws Coah. & Texas, 112.) One of the characteristic features of the Mexican system, as has been already shown, was the great reliance placed, and power re-

posed, in the executive head of the government. And this is but an ordinary instance of it.

The commission to Lewis did not, in substance, differ from the power conferred generally on commissioners, so far as it regards his duties under it. He had to determine from the facts presented to him, as applied to the law under which he acted, what amount of land appellant was entitled to. Having such authority over the subject, it may well be presumed that he determined correctly. (United States v. Clarke, 8 Pet. Rep. 443.)

It is contended, that appellant, having been appointed *provisionally* superior judge, his appointment did not last longer than the next meeting of congress, which was appointed by law to take place in about six months after his appointment. The term, "during the approaching recess of congress," is believed to refer to the time at which the appointment is to be made by the governor, and not to the duration of the appointment. The word, "provisionally," is used in the same sense in which it is used when applied to government. A provisional government is one temporarily established, in anticipation of, and to exist and continue until, another shall be instituted and organized in its stead. As the government, then, lasted sufficiently long to enable appellant to serve out his first year, and we are not apprised that a successor was ever appointed, we cannot say that the commissioner did not determine rightly, in awarding to him his one year's salary, as provided by law. As to supplying a part of the original by the commissioner, by adopting the *testimonio*, it would seem, from the authorities cited, to have been regularly done. (4 Febrero Reformado, 86, § 441.)

The last objection taken to the title paper is, "because the "papers, purporting to be his titles, were not filed in the general "land office, according to law, and are not upon any legal paper."

The first point involves a question relative in its nature, and does not arise in this case. For as the title was filed in the general land office in 1840, no one could complain, whose rights

accrued afterwards; and it, of course, does not appear when the defendants' rights respectively accrued, if any they have, upon the face of the evidence offered and objected to.

The title papers purport to be stamp paper; and nothing is shown which would lead to the conclusion that it was not appropriate, *primâ facie*, at least.   This is a matter going to the authenticity of the instrument, and may be supplied by proof *aliunde*.   And the testimony of Lewis and others, in connection with the title, which was also excluded, renders, for the present, a critical examination of this subject unimportant.   (Jones v. Montes, 15 Tex. Rep. 351.)

As to the receipt signed by T. J. Chambers, and the certificate of Crosby, as to when the land office opened, &c., it is not perceived how it would be competent to establish the facts contained in them, by their introduction without other proof. But as to the title paper, we are of opinion, that the objections to it, as evidence in the cause, should not have been sustained.

We have arrived at these conclusions upon the main questions at issue, because we have not been able or willing to repudiate the right of what was then our own State, Coahuila and Texas, to the ownership of her vacant domain, and her right to dispose of it, as attempted by her in this case in accordance with the rights assumed by her in her constitution and laws, virtually and plainly recognized by the federal authorities in 1830, and never sought to be controlled or prevented, except upon reasons of federal policy, in reference to the introduction of colonists from the United States of the North; and then only in 1835, when the overgrown usurped power of the general government was on its march to the annihilation of the States; (see Kennedy's History of Texas, p. 96 to 113;) and because we are not prepared to deny the right of the State to establish a system of judicature, adapted to the wants, principles, and intelligence of her Texan citizens.   The judgment is reversed, and the cause remanded.

                                    Reversed and remanded.

Motion to re-tax the costs.

ROBERTS, J. We are of opinion that all the evidence offered, except the title papers and the deposition of Lewis Valdez and Cazneau, was unnecessary to have been offered and introduced into the record, in order to determine the merits of the questions proper to be decided by this court, and this opinion is given as a basis for taxing the costs below.