# GONZALES *v.* ROSS.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF TEXAS.

Submitted November 2, 1886. — Decided March 14, 1887.

The Congress of Coahuila and Texas on the 28th April, 1832, passed a law respecting the grant of public lands. One Gonzales applied for a grant under this law, and, on the 16th October, 1832, the governor made the grant of the land in dispute under which the plaintiffs claim in the customary form for such grants. A commissioner was appointed to give possessory title to the tract, and on the 18th April, 1834, he delivered to the grantee at Dolores formal possession of the tract, and executed and

delivered a formal "testimonio" thereof.  On the 26th March, 1834, the Congress of Coahuila and Texas at Monclova repealed the act of April 28, 1832.  The laws of the Mexican states did not then take effect in any part of the country until promulgated there.  There was no evidence of the promulgation of the repealing act at Dolores, but there was presumptive evidence tending to show that on the 3d May, 1834, it had not been promulgated there.  *Held:* that under all the circumstances, and in view of the distances of Dolores from Monclova, the presumption was that the repealing act had not been promulgated when the commissioner extended the title to Gonzales.

The act of the Congress of Coahuila and Texas of March 26, 1834, creating a new system of disposing of the public lands, did not abrogate the grants and sales which had been made under the act of April 28, 1832, nor abolish the office and function of commissioners necessary for extending such grants.

From the notorious public history of the colony of Beales and Grant, and from other notorious facts which are stated in the opinion of the court, it is *Held,* that the governor in the gran ; to Gonzales, which is the subject matter of this suit, intended to designate and did designate the commissioner of the neighboring enterprise as the officer to locate the grant and deliver possession to the grantee, and that his official acts therein, having been accepted and acquiesced in by the government, must be considered as valid, even if done by him only as commissioner *de facto.*

The public officer who extended the lands in dispute must be presumed to have extended them in the proper department, and this presumptive conclusion of law is made certain in fact by examining the laws referred to in the opinion of the court.

In 1834 the state of Coahuila and the department of Monclova extended eastwardly at least as far as the river Nueces.

As all favorable presumptions will be made against the forfeiture of a grant, and as it will be presumed, unless the contrary be shown, that a public officer acted in accordance with law and his instructions, and as the government acquiesed in the commissioner's acts in extending the grant in dispute and no attempt had been made to revoke them or to assert a forfeiture; *Held,* that he had authority to extend the title, and his acts must be considered valid.

The testimonio in this case sufficiently connects itself with the original grant and subsequent steps taken under it: it is not necessary that it should be attached to it by a physical connection.

The grant in this case gave power and authority to the commissioner to extend it, and no further order was necessary.

The extension of the title of the grantee by the commissioner in a Mexican grant completed the title, without patent or other act of the government, and notwithstanding the imposition of conditions subsequent; and the non-performance of such conditions subsequent constituted no objection to the admission of plaintiff's evidence to show such extension.

If a forfeiture of a Mexican land grant from non-payment or condition sub-

sequent can be availed of by a private person at all, it can only be after he has shown some right to the land in himself by virtue of a subsequent purchase or grant from the sovereignty of the soil.

Prior to the adoption of the constitution of 1876 the laws of Texas did not require that a title under a Mexican grant should be registered in the county or deposited among the archives of the land office, in order to give it vitality; and it was only void as against third persons acquiring title from the sovereignty of the soil, not having notice of it.

Defences against Spanish and Mexican titles in Texas under Art. XIII of the constitution of Texas of 1876 constitute no objection to the admission of evidence in support of such titles. *Quære*, as to the effect of the provisions in that article prohibiting the future registration of titles, or the depositing of them in the land office.

TRESPASS. Plea, not guilty. Judgment for defendants. Plaintiffs sued out this writ of error. The case is stated in the opinion of the court.

*Mr. H. E. Barnard* for plaintiffs in error.

*Mr. C. W. Ogden* and *Mr. Bethel Coopwood* for defendants in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is an action of trespass to try title, brought by the heirs of Juan Gonzales against The International and Great Northern Railroad Company and their tenant in possession (Ross), to recover eleven leagues of land situate in Kinney County, Texas, adjoining the Rio Grande. The defendants pleaded not guilty, and title from the sovereignty of the soil. At the trial a jury was waived, and the court found the facts specially (which are set out in a bill of exceptions), and rendered judgment for the defendants. The judgment is based upon the failure of the plaintiffs to make out their title; and their failure to make title arose from the court's overruling and rejecting the testimony offered by the plaintiffs as evidence of the extension of title to their ancestor, Juan Gonzales.

The court found and decided that the plaintiff had shown an application for, and concession of, eleven leagues of land in the name of Juan Gonzales, in the state of Coahuila and Texas,

and gave the purport of the documents showing the same, being an exemplification of the original in the archives of the government of Coahuila, at Saltillo. These documents were in Spanish, accompanied by a verified translation. They were exemplified under date of August 20, 1874, and had been duly recorded in the clerk's office in the records of Kinney County on the 8th of February, 1878, as appeared by the clerk's certificate thereon.

The application of Gonzales, as translated, was as follows, to wit:

"To his Excellency: The citizen Juan Gonzales, before your Excellency, with greatest respect, states:

"That in accordance with the provisions of the law of colonization of the state your Excellency will please grant me the sale of eleven sitios of land of those vacant lands of the department of Monclova and places by me designated, promising to introduce in them the number of stock required by the same law and paying the value, delivering at once the fourth part of the same and binding myself to fulfil all requirements of the same law. Praying your Excellency will grant this petition as requested, will receive grace and justice.

"JUAN GONZALES."

The grant, bearing date, Leona Vicario, October 16, 1832, was attached to the application, and was in the name of the Governor in the usual form, and, as translated, was as follows:

"In accordance to article 13 of the new law of colonization enacted by the honorable Congress of the state April 28, 1832, I grant the sale to petitioner of the eleven sitios of land prayed for at the place designated by him, provided that they shall be all in one tract and not under any title belonging to any corporation or person whatsoever.

"The commissioner for the division of lands in the enterprise to which corresponds the one which petitioner solicits, and in his default, or in case there is none, or not being engaged in any other enterprise, the alcalde 1st, or the only one acting of the respective municipality or the nearest one, complying with [the] order given in the matter, will place him in

possession of the said sitios, and will extend the corresponding title to the same, first classifying the quality of said lands, so as to be able to state the amount to be paid the state, which payment must first be paid by the interested party in the manner and terms specified in the last part of said article 13, making the payment at once as provided by this article, in the treasury of the state, receipt of which he will present to the secretary, so that the secretary, upon sight of it, will proceed to give [the] interested party copy of his petition, with which he will go to the commissioner and have its requirements complied with.

> " ECA Y MUSQUIZ. (One rubric.)
> " SANTIAGO DEL VALLE, *Secretary*. (One rubric.) "

The court next found as follows :

" Second. That Fortunato Soto was duly appointed by the proper authority of the state of Coahuila and Texas, as commissioner to extend titles in the colony contracted for by Juan Carlos Beales and Diego Grant. That his commission of authority was dated March 13th, 1834, and was signed by Francisco Vidann y Vallasteñor, the then governor of the state of Coahuila and Texas and by J. Mijuel Falcon, the then secretary of state of Coahuila and Texas.

" Third. The plaintiffs are the legal heirs of Juan Gonzales, the beneficiary and grantee of the concession referred to in decision number one, above set forth.

" Fourth. That defendants are in possession of the land described in plaintiff's petition.

" Fifth. That the boundaries of the colony contracted for by Juan Carlos Beales and Diego Grant are shown by the following . . . contract of colonization entered into with the citizen Diego Grant and Don Juan Carlos Beales as empresarios to introduce 800 families in the vacant lands of the state."

The contract referred to, between the government of Coahuila and Texas and Juan Carlos Beales and Diego Grant, is then set out in full, the application bearing date October 5, 1832, and the concession October 9, 1832. It included, first,

a grant for the whole territory lying between the Rio Grande and Nueces rivers, and bounded south by the state of Tamaulipas, and north by the 29th parallel of latitude; secondly, a grant of a tract formerly granted to Woodbury and Vehlein, and subject to their right to colonize 200 families, embracing a territory over 200 miles in length, bounded north by the 32d parallel of latitude, south by the old road leading from Rio Grande to Bexar, west by the 100th degree of west longitude, and east by other grants in the interior of Texas. The first tract adjoins the southwest corner of the second; and Kinney County, in which the lands in question are situated, lies in the angle between the two tracts, but outside of both.

The 9th article of the concession to Beales and Grant has the following provision : "This colony shall be regulated and their lands divided by a commissioner of the government, who in proper time will be appointed, and will discharge his duties in accordance with the laws and instructions that for said officials have been approved by the honorable Congress."

The bill of exceptions then exhibits two maps given in evidence by the plaintiffs, certified by the Secretary of State of the United States, one being a copy taken from Disturnell's map of the united Mexican states, published in 1847, and deposited with the treaty of Guadalupe Hidalgo, 1848; the other showing the boundary line between the United States and Mexico, as laid down in Melish's map, published in 1818, and agreed to in the treaty of January 12, 1828. These maps show that the province of Texas did not then embrace any territory west of the river Nueces.

In view of this evidence and the findings of the court thereon, the plaintiffs then offered in evidence a paper purporting to be a testimonio, with formal and sufficient proof of its execution, by which testimonio it appeared that in April, 1834, the possessory title of the land in controversy was extended to Juan Gonzales, the ancestor of the plaintiffs, by Fortunato Soto, commissioner for the state in the colony of Rio Grande. This paper was in the Spanish language, and together with the authentications and translation thereof, had been recorded in the clerk's office of Kinney County on the 21st of June,

1878, as appears by the clerk's certificate thereon. The following is a copy of the said document as translated, to wit:

"In the village of Dolores, state of Coahuila, Texas, on the 18th day of the month of April, 1834, I, the citizen Fortunato Soto, as commissioner for the supr. government of the state in the colony of the Rio Grande, and in compliance with the contract celebrated (entered into) between said government and the citizen Juan Gonzales, and in accordance with the requirements and stipulations which the law provides in this matter, I extend the present title, in the name of the government and in accordance with the provision in its superior decree of the 16th of October, 1832, contained in the aforesaid contract, to the citizen Juan Carlo Beales, as attorney of the said citizen Juan Gonzales, which power of attorney he presented, of the eleven sitios of land to which said contract has reference, which said lands in their actual state I have classed as pasture lands, and which said boundaries are: Commencing from the place where the boundary line of the property of Doña Dolores Soto de Beales forms an angle between south and west, a line will be drawn to the south, prolonging in the same direction, which will there terminate the said section at a distance of thirteen thousand seven hundred and fifty varas; from whence another line will be drawn in a right angle, which, crossing the arroyo (creek) of Piedra Pinta, will have the length of twenty thousand varas; and from this point another line will be drawn towards the north parallel with the first, and of the same length, and ends with another line to the east that, crossing the same arroyo (creek), will extend up to the place of beginning; so that in all form and right he, the said citizen Juan Gonzales, may at all times prove his rights to the said eleven sitios of land, I went with his attorney, citizen Juan Carlos Beales, which, after being surveyed by the surveyor, C. Guillo Egerton, I put him in possession, and taking him by the right hand, and in the name of the supreme government of the state, walked him over the said eleven sitios of land and caused him to perform all the other ceremonies, as provided by the laws in this case of real possession, being witnesses the citizens Eduardo Little, Enrique

Brown and George Colwell, beside those of my assistance, all residents of the village, who for the validity of it signed with me, and the interested party said day, month and year, pledging himself to replace the proper paper with the seal that is required, not having at present any of the seal in this village nor its surroundings.

> " FORTUNATO SOTO.
> " THOS. H. F. O'S. ADDICKS, *De Assistencia.*
> " THOMAS PLUNCKETT, *De Assistencia.*
> " JUAN CARLOS BEALES.
> " ENRIQUE BROWN.
> " EDUARDO LITTLE.
> " GEORGE COLWELL."

" I, the citizen, Fortunato Soto, commissioner for the Supreme Government of the state of Coahuila and Texas in this colony, certify that the preceding testimonio is a literal copy legally taken from its original, which is of record in the proper book of these archives, and in compliance with article 8 of the instructions of the 25th of April, 1830, I give the present to the interested party as title, which is given on common paper, not having any of the proper seal, and for the validity of the same I signed it with the assisting witnesses in said village the 18th of April, 1834.

> " FORTUNATO SOTO.
> " THOS. H. F. O'S. ADDICKS, *De Assistencia.*
> " THOS. SAM. PLUNCKETT, *De Assistencia.*"

To the introduction of this paper the defendants objected for the following reason :

1st. It has not been proved and recorded according to law, and its registration was not authorized by law when it pretends to have been recorded. No protocol or matrix of it has been shown ever to have been filed in the archives of the General Land Office, and no such is or ever was an archive of such office; no possession of the land claimed by any one holding under it has been shown; no payment of taxes thereon by plaintiffs, or any one for them, has been shown; no com-

pliance with or fulfilment of the conditions of the law under which it purports to have been issued has been or attempted to be proved; and if it ever had any validity, it appears from the face thereof that it is such a claim as was never perfected, but wholly abandoned, and the land remitted to the public domain, and that it is a stale demand and void.

2d. It does not contain and is not based upon any executive grant, concession, or primitive title, nor does it contain any petition or application of the pretended grantee for a concession or for a survey of the land or the execution of final title of possession, nor any order referring it to the empresario order of survey, surveyor's field notes, or other constituent element of an expediente of final title, nor apt words to express a grant of land from the state by way of sale as required by law at its date; but it purports to be a kind of grant unknown to and not authorized by such law, and it appears therefrom that the same issued without authority of and against law.

3d. It purports to have been issued by one unknown to the law, claiming to exercise the powers and perform the functions of an office not then existing, but the existence, powers, and jurisdiction whereof had already been repealed, styling himself commissioner of a colony not shown to have existed, and which, it is well known, never did exist; and it is claimed to be title embracing and relating to land situated in Kinney County, as averred in the petition, which is well known to have been embraced within the Woodbury colony district at the date it bears, for which colony the person purporting to have issued it was not, and does not by the terms of the instrument pretend to have been, a commissioner or officer.

4th. It appears therefrom that its matrix or protocol, if it is in fact a testimonio of such, contained no executive concession or petition for such; no petition or application for a survey of the land, nor for the execution of final title; no reference to the empresario order of survey nor surveyor's field notes, and no one of the requisite antecedent steps, papers, documents, or acts entering into and forming the expediente of a valid final title or grant under the law in force when and where it purports to have been issued; none of which can be established by parol.

5th. It does not express any consideration paid, or to be paid, or conditions to be performed or required by law.

6th. It purports to have been executed pursuant to a contract stated to have been ratified with the executive, while the only one so to be ratified was that of an empresario.

7th. It pretends to be an absolute grant in fee, which was not authorized or contemplated by the law.

8th. If the contract it refers to was an executive concession by way of sale, this instrument shows it to have been forfeited under the law, and 'constituting no authority for the execution of this paper on the 18th of April, 1834.

9th. It has vices before the law, and is defective in manner and form, using bad grammar, awkward construction, and a form and style diverse from the usual general practice, and contains unaccustomed clauses without any reason therefor.

10th. It is not written upon sealed or stamped paper, as required by law, nor upon paper validated by the proper officers of the municipality or any other; and its execution has not been proved, and no attempt has been made to show that the persons purporting to have signed it did so when and where it bears date or in the capacity therein stated.

11th. It was never registered, as required by law, under the former government of Coahuila and Texas, nor under the republic or state of Texas; it was never presented nor any payment on it made to the collector of the former government, nor to any officer of the republic or state of Texas; it was never presented to either of the commissions established by law to investigate titles to land in the section of the state where the demanded premises are situate, nor was it ever brought forward or set up as a claim to land till more than forty years after its date, and now only with the greatest want of verisimilitude in the matters it contains and expresses.

12th. It attempts to conceal the fact that the land, if it relates to the demanded premises, was, at its date, embraced within a colony for which the one purporting to have executed it did not by its terms pretend to be a commissioner or officer, and falsely claims to have been issued in and by the commissioner of a colony which never existed.

13th. It has no receipt for any instalment of the purchase money written out at the bottom of it, as required by law, nor has any attempt been made to prove such payment.

14th. It is incompetent and irrelevant, and shows upon its face that it is not a subject of judicial cognizance, and it does not describe or identify the demanded premises, but is void for want of certainty.

15th. It is prohibited from being used in evidence by the thirteenth article of the constitution of Texas, and if it ever had any validity, it is stale and forfeited, and the land to which it relates was reunited to the public domain by legislative equivalent for reunion by office found.

The bill of exceptions states that the court sustained the said objections, and refused to admit the said document in evidence, mainly on the ground that the same was issued without authority of law, the law and instructions under which the commissioner pretended to act having been repealed prior to the execution thereof; to which ruling rejecting said documents plaintiffs, by counsel, excepted.

The court thereupon rendered judgment for the defendants.

We will first consider the main reason assigned by the court below for rejecting the evidence offered, namely, that the law and instructions under which the commissioner pretended to act had been repealed prior to the execution thereof. The law under which the grant was made to Juan Gonzales, and under which the commissioner acted in extending the title, was that passed by the Congress of Coahuila and Texas, April 28, 1832. This law, it is true, was repealed and supplied by an act of the Congress passed at the city of Monclova, March 26, 1834, and the testimonio offered in evidence is dated at the village of Dolores, April 18, 1834, some three weeks afterwards. But the laws of the Mexican states did not take effect in any part of the country until they were promulgated there; and as Dolores was situated in the present county of Kinney, about 200 miles from Monclova, and probably much more than that as the roads there ran, and as the means of communication in that region at that time were difficult and dilatory, it is not probable that the act of March 26 was promulgated at Do-

lores prior to the 18th of April. Besides, the commissioner was a public officer, having a public duty to perform, and in the absence of evidence to the contrary, the presumption would be, that he acted in accordance with the law as known at the time. This presumption is strengthened by the language of another act passed in the same session of the Congress, on the 3d day of May, 1834, which declared that certain favorable terms as to the price of lands, proffered by a law of 1830, should "be understood only in respect to the price of lands acquired until (*hasta*) the publication of the decree of 26th of March of this year," implying, it would seem, that the law of the 26th of March had not yet been published. Looking at the matter in every point of view, we think the presumption is, that this act, which was the repealing act referred to, had not been promulgated at Dolores, or in that vicinity, when the commissioner extended the title of possession to Gonzales.

In the case of *Houston* v. *Robertson*, 2 Texas, 1, 28, Chief Justice Hemphill, delivering the opinion of the court, said: "The question arises, then, as to the time at which the contract with Robertson ceased to exist. The annulling decree was enacted in May, 1835, and by its terms no date was fixed for its operative force and effect. The date of the publication of the law not being proven, the period of taking effect is a matter of presumption. . . . Under the former governments it was an undoubted principle that laws were of no binding obligation until after they were duly promulgated. (L. 1, Tit. 2, Book 3, Recop. Novisima.) The form of publishing decrees by the executive, is prescribed in Decree No. 3 of the constituent Congress of the state of Coahuila and Texas, p. 6. These decrees were transmitted to the inferior authorities, and by them published in their respective jurisdictions. . . . There was no specified period for the promulgation of the laws, nor for their going into operation, in proportion to the distance from the seat of government. The presumption would generally be in favor of the publication after the lapse of a reasonable time for its transmission from the capital; but from the peculiar circumstances of this case, we do not think that the decree ought to be enforced against the petitioner

until the period of closing the land office." In that case the decree or act referred to was passed 18th May, 1835, and the land offices were not closed until the 1st of November — more than five months afterwards. It is true, the country was in an unsettled state at that time; and this may have been one reason why the court-held that there was no presumption that the law had been promulgated. The principle enunciated, however, is applicable to the present case, and leaves little room for hesitation as to the non-promulgation of the law under consideration at Dolores within three weeks or thereabouts after its passage.

Besides this, although the act of 26th March, 1834, created a new system of disposing of the public lands, and repealed the act of 1832, it did not abrogate the grants and sales which had been made under it; nor did it abolish the office and functions of commissioners, necessary for extending such grants.

But another objection raised to the authority of the commissioner was, that he was only constituted such for the colony of Beales and Grant. This is true. But the grant for that colony comprised a territory of 20,000 square miles, and embraced in its southwest angle (though it did not include) the present county of Kinney; and we know from cotemporary history that a large addition was made to it on the west, including portions of Kinney County, by means of large grants made to individuals and transferred to the Rio Grande and Texas Land Company, which became the proprietors of the entire colony. Indeed, this very grant of Gonzales was published as one of their accessions. The fact that Juan Carlos Beales himself was the attorney who received the possession of the Gonzales tract is corroborative of this fact. But, be this as it may, it was a matter of public notoriety that Beales and Grant, or the association which they formed, made large additions to their original grant in the country lying immediately west of the Woodbury and Vehlein tract, so that it must have nearly encompassed the premises in question. In Yoakum's History of Texas, vol. 1, page 317, we find the following notice of the colony: "During the latter part of

the year 1833 began the settlement of the colony of Beales and Grant. They had obtained a concession for 800 families, to be located between the Rio Grande and the Nueces. In the last days of December, about sixty colonists, under Mr. Beales, reached the new settlement, and laid off the town of Dolores, on Las Moras, a small stream about ten feet wide and two feet deep. They remained there about a year, when they dispersed." The affidavits annexed to the original testimonio offered in evidence, state that the town was destroyed by fire in 1836. Now Dolores was situated in the southern part of the present county of Kinney, several miles west of the Woodbury and Vehlein grant, and north of the first tract described in the concession to Beales and Grant, thus showing that the colony was extended beyond the limits of those grants prior to 1834. In the certificate of the United States Consul at Matamoras, dated October 16, 1835, and annexed to the original testimonio, it is called the colony of Dolores. In cotemporary documents it was sometimes called the colony of Rio Grande, and sometimes the Beales "River grant." It it is called the Rio Grande grant in Beales's Diary, inserted in Kennedy's History of Texas, vol. 2, page 47. It will be observed that the grant to Gonzales was made directly after that to Beales and Grant, the latter being dated the 9th and the former the 16th of October, 1832. It is also evident that Gonzales indicated to the governor the region in which he intended to locate his grant, namely, in the immediate neighborhood of the territory ceded to Beales and Grant. His application says: "Your excellency will please grant me the sale of eleven sitios of land of those vacant lands of the department of Monclova, and *places by me designated.*" The words of the grant are: "I grant the sale to the petitioner of the eleven sitios of land prayed for *at the place designated by him,* provided that they shall be all in one tract and not under any title belonging to any corporation or person whatsoever." So that it was undoubtedly understood where, in general terms, the land was to be located. The grant then proceeds to designate the commissioner who should locate the land and extend the title, as follows: "The commissioner for

the division of lands in the enterprise to which corresponds
the one which petitioner solicits, and in his default, or in case
there is none, or not being engaged in any other enterprise,
the alcalde 1st, [that is, the first alcalde,] or the only one
acting, of the respective municipality." Now, what commis-
sioner was meant, or could be meant, but the commissioner of
the Beales and Grant colony? — probably the only colony
within a hundred miles. It is not said, "the commissioner for
the enterprise *in which the lands lie*," but "the commissioner
for the enterprise *to which corresponds the one which petitioner
solicits.*" From all the circumstances taken together, it is
obvious to us that the commissioner of the Beales and Grant
colony was the very one intended. We have only the trans-
lation of the grant before us, which is somewhat awkwardly
expressed; but, according to that (which is our only guide),
we think it was not the commissioner of the enterprise in
which the lands were to be located, (for, as understood by the
parties, they were not to be located in any existing enterprise,)
but the commissioner of the neighboring enterprise, that was
intended to be designated. There was no other enterprise in
that region, at least so far as we know.

A strong circumstance in favor of this conclusion is the fact
that Soto's official acts as commissioner, in this case, were
never repudiated by the government; on the contrary, his
protocol was received and deposited in the public archives,
where it still remains. His official acts, accepted and ac-
quiesced in by the government, must be considered as valid,
even if done by him only as a commissioner *de facto.*

The pretence that Soto designates himself in the testimonio
as commissioner in the colony of Rio Grande, and that no such
colony is known to have existed, is too frivolous to deserve
serious attention. It is well known, as already stated, that
the colony was designated by various names, "Rio Grande,"
amongst the rest, and Soto was well and publicly known as
the commissioner thereof. It was the first great colony
attempted to be established in Coahuila and Texas on the Rio
Grande, and nothing was more natural than to call it by that
name. Besides, it was situated in the old district of Rio

Grande, which was afterwards annexed to the department of Monclova, as hereafter stated.

The criticism of the defendants in error, that it was not shown that the lands in question were in the department of Monclova, is not well founded. In the first place, it will be presumed that they were situated in that department if nothing is shown to the contrary. The public official who extended the lands must be presumed to have extended them in the proper department. But there cannot be any doubt that they were situated in the department of Monclova. Prior to the constitution of March 11, 1827, the state of Coahuila and Texas was divided into five districts or departments: Saltillo, Parras, Monclova, Texas, and Rio Grande: Article 7 of Laws and Decrees of Coahuila and Texas, Houston, 1839, page 47; but by that instrument (Art. 7), it was declared that "for the better administration thereof, the territory of the state shall for the present be divided into three departments, as follows; viz.: *Bexar*, embracing all the territory corresponding to what was called province of Texas, which shall form one sole district; *Monclova*, consisting of the district of the same name and that of Rio Grande; *Saltillo*, comprehending the district of the same name and that of Parras, Ib. page 314. Power was given to the Congress to alter and modify this division. We find only the following laws of the Congress on the subject: First, a law passed January 31, 1831, setting off a new district from the eastern part of Bexar, to be called the district of Nacogdoches, Ib. page 171. Secondly, a law passed in April, 1833, declaring that the district of Saltillo should constitute a sole department by itself; and that the district of Parras should constitute another separate department, Ib. page 210. Thirdly, a law passed 18th March, 1834, dividing the state into seven departments or districts, to wit: Bexar, Brazos, Guerrero, Monclova, Nacogdoches, Parras, and Saltillo. Article 2 declared that in the section denominated Coahuila the limits and capital towns of each shall be the same as heretofore. Article 3 created Brazos from the eastern part of Bexar. By Article 4 the limits of the department of Nacogdoches were continued as before. The boundaries of Guerrero

are not given, Ib. page 245. This shows that no alteration was made in the limits of the departments in Coahuila. Saltillo and Parras were in the southern part of Coahuila, and Monclova comprised the northern part, and joined the department of Bexar, which (as shown above) corresponded with the old province of Texas. This makes it certain that the department of Monclova included the lands in question; for the old boundary between Coahuila and Texas was situated over 100 miles east of the Rio Grande; and the northern boundary of Tamaulipas, which joined Coahuila on the southeast, and also separated the province of Texas from the Rio Grande, was some 70 or 80 miles southeast of the county of Kinney. Captain Pike, who traversed the country from Chihuahua to Texas in 1807, passing through Coahuila and the centre of the first tract described in Beales and Grant's purchase, and who was very minute and particular in his observations, locates the exact boundary between Coahuila and Texas at that time. After describing his passage of the Rio Grande near Presidio, and four days' travel from thence northeastwardly, a distance, in all, of 136 miles, he gives the following account of his fifth day's journey: "*7th June, Sunday.* — Came on 15 miles to the river Mariano [now *Medina*], *the line between Texas and Cogquilla* [Coahuila] — a pretty little stream, Rancho. From thence in the afternoon to Saint Antonio." Pike's Expedition, page 265. Other authorities also state that the Medina was the old boundary between Coahuila and Texas. At a later date, perhaps in virtue of some law not published in the general collection of laws, Texas seems to have been extended to the river Nueces. It is so laid down on several maps, (see map in Ward's "Mexico in 1827," and others of that period,) and Hon. David G. Burnet, a resident of Texas long before its independence, and afterwards first President of the Republic, in a letter written in November, 1830, and published at the time, after stating that Texas in its most extensive acceptation was bounded by the Rio Grande, says: "This definition, however, is not in strict accordance with the political organization of the country, as the state of Tamaulipas and the department of Coahuila both cross the Rio Grande, making the Nueces

strictly the western limit." (See also speech of Mr. Benton in the United States Senate, May 16, 1844.) There can be no doubt, therefore, that in 1834 the state of Coahuila and the department of Monclova extended eastwardly as far as the river Nueces, at least, and consequently included the premises in question.

Another objection to the authority of the commissioner to extend the title in controversy was, that the time limited by the act of 1832 for reducing the grant to possession had expired. The 16th article of the law declares that the purchasers shall enter into possession of the land acquired within eighteen months from the ratification of the contract, under penalty of forfeiture for the non-fulfilment thereof. In this case the concession was dated October 16, 1832, and the testimonio is dated April 18, 1834, two days more than eighteen months afterwards. This objection assumes that possession was given on the date of the testimonio. But that does not appear. The latter was executed at Dolores, ten or a dozen miles from the premises in question. The document had to be prepared after the parties returned to the village. They may not have returned the same day. All favorable presumptions will be made against the forfeiture of a grant. As before said, it will be presumed, unless the contrary be shown, that a public officer acted in accordance with the law and his instructions. The government accepted Soto's acts, and it does not appear that any attempt was ever made to revoke or annul his proceedings, or to assert a forfeiture for the cause now insisted on. We think that the mere date of the testimonio is not sufficient under the circumstances to make it invalid. Besides, it will be observed that the law does not say that the delivery of possession after the eighteen months shall be void, but only that it shall be a ground of forfeiture of the grant. And, of course, the forfeiture, if incurred, might be waived by the government, and we think it was waived by accepting and acquiescing in the commissioner's acts.

On the whole we think it clear that Fortunato Soto had authority to extend the title in question, or, at least, that his official acts were acquiesced in by the government, and are to be considered as valid.

But objections were made to the instrument itself; namely, to the testimonio which was offered in evidence for the purpose of proving and authenticating the commissioner's acts. One of these objections was, that it does not connect itself with any grant, concession or primitive title, nor contain any petition for a concession, or for a survey of the land, or execution of final title of possession, nor any order referring it to an empressario's order of survey. It is a sufficient answer to the first part of this objection to refer to the testimonio itself, which does in terms refer to the original contract between the government and Juan Gonzales, giving its date, and purporting to be executed in accordance with its provisions. We do not see how it could connect itself any more closely with the original concession, unless it were tied to it by a string, or fastened to it by a wafer, as is often done. But we do not remember to have seen it decided that a string or a wafer is a constituent or necessary part of the title. The objection is wholly without foundation. Gonzales had a grant which authorized a commissioner to extend it in possession. The proper commissioner did so extend it, and this was shown by the testimonio — the proper documentary evidence for that purpose. In the recent case of *Hanrick* v. *Jackson*, 55 Texas, 17, 27, the Supreme Court of Texas says: "We know of no authority for saying that the title is void because, he, [the officer] has not incorporated into it the evidence of the concession or sale. If there was, in fact, no concession, there could have been no legal grant by the alcalde. But whether there was a concession, and whether there was proper evidence of it presented to him by the interested party, was a matter for his official inquiry and determination. Whether he set forth in the title the evidence upon which he acted, or merely recited as a fact that a concession had been granted and authority given him by the government to extend the title, the presumption which is always indulged in favor of the validity of acts of officers of a former government, warrants the conclusion that the officer acted in conformity with law and not in violation of it."

As to the remainder of the objection, it is sufficient to say, that no petition or order was necessary to have the grant

extended in possession. The grant itself, as stated above, gave power and authority to the proper commissioner to extend it; and no further order for that purpose was required.

It was also objected that the testimonio was not written upon properly stamped paper. But this did not affect its validity. With a proper stamp, it would require no proof of its execution. Without a proper stamp, its execution must be proved. *Jones* v. *Montes*, 15 Texas, 351, 352; *Chambers* v. *Fisk*, 22 Texas, 504. The court finds that formal and sufficient proof of its execution was offered. We think that the testimonio was sufficient in point of form, and that it contained all the requisites necessary to invest Gonzales with title in the land delivered to him; and that the description of the land was sufficiently specific to identify it.

We are, therefore, of opinion that the court below should have admitted the testimonio in evidence, unless it was incompetent by reason of some matter or thing occurring after its execution and delivery to Gonzales.

Analyzing the various and somewhat confused and multifarious objections of the defendants, we find three such matters assigned as grounds for rejecting the evidence: First, the non-fulfilment of the conditions of the grant; secondly, that no protocol, or matrix of the concession or testimonio, was amongst the archives of the land office, nor on record in the proper county in proper time; thirdly, that, not being amongst the archives, and not being recorded in proper time, and never being followed by actual possession, the testimonio was an absolute nullity by force of the XIIIth Article of the Constitution of 1876.

These matters may constitute very good and substantial grounds of defence, and we are not disposed to intimate anything to the contrary in this opinion. But we think they can only be effectual by way of defence.

As to the supposed forfeiture for non-fulfilment of conditions of the grant, the only condition named therein is the payment of the purchase money. This was required by the 13th article of the law of the 28th of April, 1832, which, on this subject, declares as follows: "The purchaser shall deliver one-

fourth of the value of the land granted to the state treasury, or where the executive designates, at the time of the sale; and the remaining three-fourths shall be paid, the first on the second, the second on the third, and the last on the fourth year, under penalty of forfeiting the right acquired in the part wherein this provision is not fulfilled;" that is, as we understand it, the forfeiture was to be in proportion to the amount not paid. Now, it is clear that the first payment was made in advance; for the grantee could not have obtained possession of his document of concession without such payment; and that he did obtain it is manifest, for the testimonio shows that it was exhibited to the commissioner. The other payments were to be made afterwards, and after the lands were extended, and the condition of forfeiture for non-payment was a condition subsequent. Whether these payments were made, or not made, was not shown by proof at the trial. If not made, then there was a forfeiture which the government could enforce, either by judicial proceedings, or, perhaps, by granting the land to other parties. This forfeiture accrued, at the revolution, to the Republic of Texas, and to the State of Texas, when it became a state. By the constitution of the state, adopted in 1845, Art. XIII, it was declared that "all fines, penalties, forfeitures, and escheats, which have accrued to the Republic of Texas under the constitution and laws shall accrue to the State of Texas; and the legislature shall by law provide a method for determining what lands may have been forfeited or escheated." No such law was ever passed prior to the trial of this cause. We held in *Airhart v. Massieu*, 98 U. S. 491, 498, that, under this provision, the legislature must first act before any proceedings can be taken to annul the title of an alien, or any other escheatable titles; and this proposition would seem to apply with equal force to forfeitures. At all events, if a forfeiture for non-payment, or other condition subsequent, can be availed of by a private person, it can only be after he has shown some right to the land in himself, by virtue of a subsequent purchase or grant from the sovereignty of the soil; and, hence, it can only be set up by way of de-

fence after such purchase or grant is shown, and not as an objection to the admission of the plaintiff's evidence.

The importance of that evidence to the plaintiff's case is manifest. The extension of title by the commissioner, in these Mexican grants, completed the title without any patent or other act of the government, and notwithstanding the imposition of conditions subsequent. If the concession imposed conditions precedent, the case would be different. This subject is discussed in the case of *Hanrick* v. *McKinney*, 7 Texas, 384, 451, where the court, after examining some decisions of this court, says: "The conditions, in the cases cited by counsel, were conditions precedent; and not until after their performance, as we have seen, was the title to be delivered. Titles issued to colonists and purchasers under the colonization laws of Coahuila and Texas were of an entirely different character. Under those laws the title of possession was the final title, vesting the fee absolutely in the grantee. Conditions were annexed, . . . but they were conditions subsequent, upon the non-performance of which the titles were subject to forfeiture, but until which the fee or proprietorship was in the grantee. They conveyed all the estate and interest which the government had to convey, as absolutely and to the same extent as did the delivery of the final title, or the final act of confirmation by the Spanish government, after the performance of the conditions. No act of confirmation by the government was required or was contemplated by the colonization laws; but when the title of possession issued, the government had done the final act on her part." The testimonio in that case was substantially the same as in the present, and was sustained as conferring title upon the party.

As to the matter of registration, the laws of Texas prior to the adoption of the constitution of 1876, so far as we can discover, did not require that a title should be registered in the county, or deposited amongst the archives of the land office, in order to give it validity. It was only void as against third persons acquiring title from the sovereignty of the soil, not having notice of it. In this respect the laws of Texas were not dissimilar to those of most of the states of the Union.

Indeed, the original titles could not be deposited in the land office when, as was often the case, they belonged to the archives of the foreign government at Saltillo, or other place where they were originally deposited. Copies of them, amounting to second originals, or testimonios of the final title, might be so deposited, or might be registered in the proper county; but even that was not necessary to their validity, although it might be necessary to protect the owners against titles subsequently acquired without notice of their existence. It is manifest, however, that titles thus subsequently acquired, if relied on by a defendant, must be proved as matter of defence, and cannot be urged against the competency of the plaintiff's evidence of his title.

This, as we understand it, was the condition of things (except with regard to certain extensive and fraudulent grants, which were specially abrogated by constitutional or legislative enactment) until the adoption of the constitution of 1876. By the XIIIth Article of that instrument it was decreed as follows:

ARTICLE XIII. — SPANISH AND MEXICAN LAND TITLES.

"SECTION 1. All fines, penalties, forfeitures, and escheats, which have heretofore accrued to the Republic and State of Texas, under their constitutions and laws, shall accrue to the state under this constitution; and the legislature shall provide a method for determining what lands have been forfeited, and for giving effect to escheats; and all such right of forfeiture and escheat to the state shall, *ipso facto*, enure to the protection of the innocent holders of junior titles, as provided in sections 2, 3, and 4 of this article.

" SEC. 2. Any claim of title or right to land in Texas, issued prior to the 13th day of November, 1835, not duly recorded in the county where the land was situated, at the time of such record; or not duly archived in the General Land Office; or not in the actual possession of the grantee thereof, or some person claiming under him, prior to the accruing of junior title thereto, from the sovereignty of the soil, under circumstances reasonably calculated to give notice to said junior

grantee, has never had, and shall not have, standing or effect against such junior title, or color of title, acquired without such or actual notice of such prior claim of title or right; and no condition annexed to such grants, not archived, or recorded, or occupied as aforesaid, has been, or ever *shall* be released or waived, but actual performance of all such conditions shall be proved by the person or persons claiming under such title or claim of right in order to maintain action thereon, and the holder of such junior title, or color of title, shall have all the rights of the government which have heretofore existed, or now exist, arising from the non-performance of all such conditions.

" SEC. 3. Non-payment of taxes on any claim of title to land, dated prior to the 13th day of November, 1835, not recorded, or archived, as provided in § 2, by the person or persons so claiming, or those under whom he or they so claim, from that date up to the date of the adoption of this constitution, shall be held to be a presumption that the right thereto has reverted to the state, and that said claim is a stale demand, which presumption shall only be rebutted by payment of all taxes on said lands, state, county, and city or town, to be assessed on the fair value of such lands by the comptroller, and paid to him, without commutation or deduction for any part of the above period.

" SEC. 4. No claim of title or right to land, which issued prior to the 13th day of November, 1835, which has not been duly recorded in the county where the land was situated at the time of such record, or which has not been duly archived in the General Land Office, shall ever hereafter be deposited in the General Land Office, or recorded in this state, or delineated on the maps, or used as evidence in any of the courts of this state, and the same are stale claims; but this shall not affect such rights or presumptions as arise from actual possession. By the words ' duly recorded,' as used in sections 2 and 4 of this article, it is meant that such claim of title or right to land shall have been recorded in the proper office, and that mere errors in the certificate of registration, or informality, not affecting the fairness and good faith of the holder thereof, with which the record was made, shall not be held to vitiate such record."

We do not see that these sections alter the character of the objections as matters of defence. A man whose title was good in 1876, when the constitution was adopted, whether his muniments of title were on record or not, could not be deprived of it by a simple *ipse dixit* of the constitution, any more than by a legislative act. Some proof, at least, must be given in a judicial proceeding to show that his title was forfeited, if that be the fact; and that proof, in a private action, must be given by a party exhibiting a title acquired from the sovereignty of the soil or in some other legitimate way. When the testimonio in the present case was offered in evidence, no such proof had been given. So far as appeared up to that moment the defendants were mere trespassers, and surely trespassers cannot claim the benefit of the constitutional provisions. Besides, it cannot be assumed, as is assumed in the objection of the defendants, either that the plaintiffs' muniments of title were not on file amongst the archives of the land office, or that the taxes on the lands had not been paid, or that Gonzales and those claiming under him did not continue in possession of the land after possession was delivered to him by the commissioner in 1834.. By the rules of law, possession will be presumed to accompany ownership until the contrary is proved; and constructive possession consequent upon legal ownership is sufficient as against mere trespassers, that is, as against those who do not show some right of possession. So, with regard to the archive of title, it was held in *Byrne* v. *Fagan*, 16 Tex. 391, 398, that where there is a testimonio there is a presumption that the original is among the archives of the land office, its proper place of deposit. At all events, it is for the defendants to show by proper proof that it was not there. As to the want of registration in the county where the lands lie, as before said, no registration was necessary to the validity of a title prior to the constitution of 1876. It is unnecessary, at this time, to decide upon the effect of the provision contained in that constitution prohibiting the future registration of titles, or the depositing of them in the land office. If its effect is to make titles void which were before good, a grave constitutional question may arise, with regard to its validity, which we would

prefer not to pass upon until it has received the consideration of a local court, state or federal. In our judgment, all the matters of objection to the plaintiffs' title, arising under the constitution, are matters of defence, and could not properly be urged to prevent the title of the plaintiffs from being received in evidence.

*The judgment of the Circuit Court is reversed, and the case is remanded, with directions to award a new trial.*