NATIONAL PIANO MANUFACTURING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

*Docket Nos. 3333, 20486. Promulgated March 20, 1928.*

*Frank E. Seidman, C. P. A.*, and *Jacob S. Seidman, Esq.*, for the petitioner.

*Orris Bennett, Esq.*, and *John F. Greaney, Esq.*, for the respondent.

54

(46)

**OPINION.**

SIEFKIN: This proceeding raises questions as to—

1. Whether assessment and collection of taxes for the year 1917 are barred by the statute of limitations;

2. The inclusion of income of the petitioner's predecessor in the petitioner's income for the year 1917;

3. Affiliation of petitioner and the Sparta Manufacturing Co.;

4. Respondent's failure to deduct from taxable income in 1922 and 1923 an alleged net operating loss sustained by petitioner in 1921;

5. The deduction from income of petitioner of $22,948.76, which was the amount of income tax of the National Automatic Music Co. for the year 1921 which the petitioner paid in 1922 under an alleged agreement;

6. Deduction of tentative tax in the computation of earnings available for dividends;

7. The value on July 8, 1909, of an application for a patent, for purposes of invested capital for each of the years in controversy;

8. Relief under section 210 of the Revenue Act of 1917;

9. Prewar credit;

10. Patent values as of May 1, 1917, for purposes of calculating exhaustion, wear and tear on patents for each of the years in controversy;

11. Application of 1921 net loss against 1922 and 1923 income, in the event that application of exhaustion, if allowed, results in a net loss during that year.

---

1. The return for the year 1917 was filed on March 30, 1918, and the deficiency letter was dated February 20, 1925. On February 4, 1921, the petitioner executed an instrument in writing designated a waiver, by the terms of which the time for assessment of 1917 taxes was extended indefinitely. This "waiver" was signed on behalf of the respondent on February 7, 1923.

Another instrument, bearing date of February 26, 1924, extended the time for determination, assessment and collection of taxes for 1917 for one year. No date of approval by the respondent appears upon the instrument.

On January 30, 1925, another instrument was executed by the petitioner extending the time for assessment of 1917 taxes to December 31, 1925, provided that if a notice of deficiency in tax was sent before that date, the time should be extended 60 days, or if an appeal was filed with the Board of Tax Appeals, the time should be extended by the number of days between the mailing of the notice of deficiency and the date of final decision of the Board. This instrument bears no date of approval by the respondent.

On November 19, 1925, the petitioner executed another instrument whereby time for assessment was extended to December 31, 1926, with the same provisions as the preceding "waiver." This instrument bore no date of approval by the respondent.

All of these instruments bear the name of the respondent, but only one bears the date of approval by him. The petitioner contends

that since it is not shown whether they were signed by the respondent or a duly authorized agent, and no date of signing is shown, they do not constitute valid consents.

In *Perkins Land & Lumber Co.*, 9 B. T. A. 528; *Trustees of Ohio & Big Sandy Coal Co.*, 9 B. T. A. 617; and *Greylock Mills*, 9 B. T. A. 1281, we held that it is not necessary for the Commissioner to personally sign consents.

In *Trustees of Ohio & Big Sandy Coal Co.*, *supra*, we stated:

* * * It is a general principle to presume that public officials act correctly, in accordance with the law and their instructions, until the contrary appears. *Griffith* v. *American Gold Mining Co.*, 136 Fed. 69, 73, citing *Ross* v. *Reed*, 1 Wheat. 482, 484, and *Gonzales* v. *Ross*, 120 U. S. 605, 622.

\* \* \* \* \* \* \*

Even if it could be assumed, from the mere showing that the consents were not personally signed by the Commissioner of Internal Revenue, that they did not then become effective so as to suspend the running of the statute, the record is sufficient to show that the Commissioner's office considered the consents valid and that the Commissioner himself, even if he had not done so before, ratified and approved that which had been done when he made his final determination of the deficiencies and mailed notices thereof to the petitioners.

We are of the opinion that these instruments constituted valid consents to extensions of the time for determination, assessment and collection of taxes for 1917, to February 26, 1926, and under section 277 (b) of the Revenue Acts of 1924 and 1926, assessment and collection is not now barred, since this proceeding is now pending and since, under the Revenue Act of 1926, the Commissioner is prohibited from making an assessment while such proceeding is pending. See sections 277 (b), 274 (a) and 283 (b), (c) of the Revenue Act of 1926.

2. The respondent, in computing the tax liability of the petitioner for 1917, considered its net income as $76,213.01. It is stipulated between the parties that $59,390.68 was the true net income of the petitioner from May 1, 1917, to December 31, 1917, and that the balance was income to the petitioner's predecessor in 1917 prior to May 1, 1917. The petitioner was organized on May 1, 1917. It is clear that it is not liable in this proceeding for taxes of another corporation.

3. The officers of the Sparta Manufacturing Co., which produced a peanut machine, and the petitioner were the same. Both concerns produced a coin-operated slot machine, each installed only the slot mechanism instead of manufacturing the whole machine, each distributed its product in the same manner over the same general field, and the employees of the petitioner often worked in the plant of the Sparta Manufacturing Co. along mechanical or engineering lines. On May 1, 1917, the petitioner consolidated with this company, buying all its stock. It is stipulated between the parties that

if the petitioner and the Sparta Manufacturing Co. were in closely related businesses since May 1, 1917, the other facts necessary for consolidation are present. It is further stipulated that from May 1, 1917, to December 31, 1917, the Sparta Manufacturing Co. sustained a taxable net loss of $19,044.80. The evidence shows that these companies were in closely related businesses and the tax liability of both companies should, therefore, be determined upon a consolidated basis.

4. Petitioner alleges that the respondent, in computing the taxable income of the petitioner for the calendar years 1922 and 1923, erred in failing to deduct an alleged net operating loss sustained during the year 1921. This was stated in the petition as being in the amount of $83,840.00, and alleged to be due to the worthlessness of the stock of the Sparta Manufacturing Co., which the petitioner purchased on May 1, 1917. The respondent admits in his answer that the working assets of the Sparta Manufacturing Co. were sold on June 21, 1921, for $6,000, but in its brief the petitioner has apparently abandoned this point. An exhibit introduced in evidence indicates that petitioner paid $81,190 for stock of the Sparta Manufacturing Co. No evidence was introduced to show that the stock of the Sparta Manufacturing Co. became worthless, or if so, when, and it is therefore impossible to determine whether a loss was sustained or not, even if a loss could be sustained on stock of an affiliated company. See *United States Trust Co.*, 1 B. T. A. 901; *H. S. Crocker Co.*, 5 B. T. A. 537.

5. In 1922 the petitioner paid the 1921 income tax of the National Automatic Music Co., amounting to $22,048.76. In preparing its return for 1922 the petitioner made no deduction for this, but now claims that the payment of this tax was deductible as part of the cost incurred in deriving the income from servicing the pianos sold to the National Automatic Music Co.

The pertinent portion of the contract is as follows:

(c) The party of the first part will maintain all such pianos in repair and change the music thereon as often as in its judgment may be required and will change the locations thereof whenever in its judgment it may be necessary, paying all the expenses of operation and maintenance of such pianos, including the expense of weekly collections, and shall receive as compensation twenty per cent (20%) of the net returns after payment of percentage to location lessee.

Nothing in the contract indicates that the petitioner assumed the obligation of paying the income tax of the National Automatic Music Co. and petitioner has, therefore, not shown that its payment thereof is a deductible item.

6. In computing the deficiency for 1917, the respondent set up a tentative tax of $36,791.49, which was deducted by him on a pro rata accrual basis from earnings available for dividends.

The petitioner contends that the computation is erroneous because the earnings and dividend figures include the earnings and divi-

dends of the predecessor company, and further contends that the use of an accrued tentative tax is improper.

We must hold that the respondent has erred in this respect, since, in *L. S. Ayers & Co.*, 1 B. T. A. 1135, we held that the invested capital of a corporation may not be reduced, in determining the extent to which a dividend is paid from current earnings of a year, by a "tentative tax" theoretically set aside out of such earnings pro rata over such year.

7 and 8. On July 8, 1909, the petitioner's predecessor obtained from C. L. Pierce, the rights in the Kingsley-Carlson patent application for $140,000 par value of its common stock and $50,000 par value of its preferred stock. At a meeting on this day, the board of directors stated that they believed that the patent application had a fair cash value of $190,000. There was also received for the $190,000 stock, besides the rights in the application, the right to any application which might afterwards be made by Pierce or the inventors, Kingsley and Carlson, covering the invention or any improvements thereon.

The whereabouts or existence of the parties to the transfer of the patent application are now unknown to the petitioner.

The petitioner asks that we determine, if possible, the value on July 8, 1909, of this application for purposes of invested capital.

Section 207(a) of the Revenue Act of 1917, provides:

(3) * * * (b) * * * but good will, trade-marks, trade brands, franchise of a corporation or partnership, or other intangible property, bona fide purchased, prior to March third, nineteen hundred and seventeen, for and with interest or shares in a partnership or for and with shares in the capital stock of a corporation (issued prior to March third, nineteen hundred and seventeen), in an amount not to exceed, on March third, nineteen hundred and seventeen, twenty per centum of the total interests or shares in the partnership or of the total shares of the capital stock of the corporation, shall be included in invested capital at a value not to exceed the actual cash value at the time of such purchase, and in case of issue of stock therefor not to exceed the par value of such stock.

Since the statute defines patents as intangible property we assume that an application for a patent is also intangible property and may be included as invested capital subject in amount to the actual cash value thereof, not to exceed the par value of stock issued therefor. See *Individual Towel & Cabinet Service Co.*, 5 B. T. A. 158. The invested capital value is not affected by the 20 per cent limitation of the Act, as 20 per cent of the capital stock outstanding on March 3, 1917, was more than the stock issued for the application.

The patent legal service account in the books of the petitioner and its predecessor contained entries crediting patent legal services on account of expenses in the amount of $2,103 from November 13, 1912, to May 1, 1917. Between 1913 and 1917 expeditures in con-

nection with the patents and experimental work had been incurred and charged to expenses in an unknown and substantial amount.

The petitioner submits that because it can not be definitely ascertained whether other value besides the patent application was obtained for the $190,000 stock, and because it is impossible to determine the amount which was expended for developing the patents and charged to expense, which should be included in invested capital, the petitioner is entitled to relief under section 210 of the Revenue Act of 1917.

At the hearing the petitioner moved that if the taxpayer is entitled to relief under section 210 of the Revenue Act of 1917, the petitioner be afforded an opportunity to show cause why any comparatives applied by the Commissioner ought not to be used and in the affirmative that it be allowed to submit evidence under Rule 50 as to the proper comparatives. This motion was overruled at the time, but was to be considered in deciding the case if necessary.

It is settled that the cost of developing patents is a capital expense. *Gilliam Manufacturing Co.*, 1 B. T. A. 967; *Goodell-Pratt Co.*, 3 B. T. A. 30.

In *Deltox Grass Rug Co.*, 7 B. T. A. 811, special assessment was allowed where development costs over a long period of time were charged to expense and the accounting method used precluded the restoration of such costs to invested capital.

While it seems clear that the only thing which was received for the $190,000 stock was the right in the Kingsley-Carlson patent application, the fact that the board of directors of the company stated that the application had a value of $190,000 is not conclusive evidence of its value, and we do not have sufficient evidence to permit us to determine what the value was. The testimony shows that the cost of development of patents was charged to expense in an unknown and substantial amount. In view of the foregoing, the petitioner is entitled to have its tax computed under the provisions of section 210 of the Revenue Act of 1917, and is herewith allowed to submit evidence under Rule 62 as to the proper comparatives to be used.

9. The net income and invested capital of the predecessor corporation (excluding any amount on account of patent application), during the prewar period was as follows:

| Year | Invested capital | Net income | Percentage |
|------|------|------|------|
| 1911 | $8,000.00 | $2,036.00 | |
| 1912 | 11,020.00 | 21,570.24 | |
| 1913 | 36,390.20 | 28,439.65 | |
| Total | 55,410.20 | 52,045.89 | |
| Average | 18,470.17 | 17,348.63 | 93.87 |

Section 203 of the Revenue Act of 1917 provides:

That for the purposes of this title the deduction shall be as follows, except as otherwise in this title provided—

(a) in the case of a domes.ic corporation, the sum of (1) an amount equal to the same percentage of the invested capital for the taxable year which the average amount of the annual net income of the trade or business during the prewar period was of the invested capital for the prewar period (but not less than seven or more than nine per centum of the invested capital for the taxable year), and (2) $3,000.

Section 204 of the same Act prescribes the same method where a business " is substantially a continuation."

When the petitioner filed its 1917 return it took the minimum deduction of 7 per cent, and this was accepted by the respondent in his calculations. From the above facts we find that 9 per cent is the proper percentage to use.

10. The evidence shows that of the 12 patents which the petitioner acquired on May 1, 1917, the majority were related to the Kingsley-Carlson patent, which was the basic patent, and that their valuable life would end at its expiration date, August 26, 1930.

These patents were the very foundation of the petitioner's business, and as they covered the manufacture of an automatic coin selective piano which was superior to any other on the market, it is apparent that they had considerable value. The petitioner, under contract, was to deliver pianos to the National Automatic Music Co. at a price of $750 par value of the stock of the Music Company. This stock, in 1917, was selling for 50 per cent over its par value. There was a large field for the sale of this type of piano. It was not until 1918 that the Government restricted the manufacture of pianos. A witness testified that at the time of incorporation of the petitioner a profit of $300 for each piano produced could have been realized and that about 1,500 pianos could be produced each year. This testimony as to production must be largely discounted, however, in view of the number of pianos actually manufactured and in the light of the evidence showing that at all times the instruments were being sold as fast as they could be produced. In 1917 more pianos were manufactured than ever before and the number was only 369. In the prior 9 years of its existence the petitioner and its predecessor had produced 1,348 pianos.

On an average investment in fixed assets of about $8,100 and an average tangible investment of about $62,000 during the period from 1913 through 1916, the National Piano Manufacturing Co. of Illinois realized a profit of about $75,000 per year on the sales of pianos. During this period about 200 pianos were being produced per year. The $75,000 does not actually represent the net income of the company, as losses were sustained on the servicing agreement. The company was conservative in its exploitation of the patents. It borrowed no money nor did it do any advertising. Based upon all the evidence

we are of the opinion that on May 1, 1917, the patents had a fair market value of $250,000.

Section 12 (a) of the Revenue Act of 1916 provides:

In the case of a corporation, joint-stock company or association, or insurance company, organized in the United States, such net income shall be ascertained by deducting from the gross amount of its income received within the year from all sources—

\* \* \* \* \* \* \*

Second. All losses actually sustained and charged off within the year and not compensated by insurance or otherwise, including a reasonable allowance for the exhaustion, wear and tear of property arising .out of its use or employment in the business or trade; \* \* \*

Exhaustion should be allowed for each of the years in question based upon a value of $250,000 and a life of the patents to be terminated August 26, 1930.

11. If, as a result of the allowance for exhaustion on the patents in 1921, a net loss is shown, such loss should be applied against subsequent net income as provided by section 204 of the Revenue Act of 1921.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*

GREEN did not participate.